[S. F. No. 21146. In Bank. Jan. 17, 1963.]

LUCIANO A. SABELLA et al., Plaintiffs and Appellants, v.
J. W. WISLER, Defendant and Appellant; NATIONAL
UNION FIRE INSURANCE COMPANY, Defendant
and Respondent.

Carter, Terreo & O'Connell and Loyd W. Carter for Plaintiffs and Appellants.

Bagshaw, Schaal, Martinelli, Weissich & Jordan and A. E. Bagshaw for Defendant and Appellant.

Thornton & Taylor and Jerome F. Downs for Defendant and Respondent.

WHITE, J.†—Defendant J. W. Wisler, the builder of a home found to have been negligently constructed upon an

†Retired Justice of the Supreme Court sitting pro tempore under assignment of the Chairman of the Judicial Council.

improperly compacted lot, appeals from a judgment in the amount of $8,200 in favor of plaintiff-owners Luciano and Diane Sabella for extensive damages sustained to their home as a result of subsidence of the supportive and nearby earth. The Sabellas appeal from that portion of the judgment decreeing that defendant National Union Fire Insurance Company, which had issued an "all physical loss" policy upon their home excluding coverage for loss by settling, cracking, shrinkage . . . [unless loss by collapse ensues]," was exempt from liability under the policy because plaintiffs' loss was caused by "settling" within the meaning of the above exception to the insurance coverage. The judgment roll, plus the exhibits presented to the trial court, constitutes the record herein.

It appears from the findings of the court below, which may not be controverted on this judgment roll appeal (*White* v. *Jones,* 136 Cal.App.2d 567, 569 [288 P.2d 913]), that the factual background surrounding this litigation is as follows: Prior to 1953 or 1954 there existed in San Anselmo, Marin County, a quarry site at the base of a rock cliff wherein "a substantial pit had been excavated." During the rainy season this pit accumulated rain and surface water and was used by children as a swimming and wading pond. The pit was also used over the years by individuals in the neighborhood as a dumping place for "tree trimmings and cuttings and other similar waste matter."

In the year prior to February 1954, a general contracting firm filled the pit with nearby dirt and rock outcroppings pushed into the hole by earthmoving machinery. The accumulation of "tree cuttings and other waste material" was not removed but merely covered over. Nor was the fill material pushed into the pit specifically compacted or consolidated except as the weight of the earthmoving machinery did so in the process of filling. The land was then substantially level and, since located at the base of a substantial rock cliff, did not appear, superficially, to be filled land.

Defendant Wisler, an experienced home builder and contractor in Marin County, purchased the parcel of land from the general contracting firm in February 1954. Although he constructed a house thereon, according to findings of the trial court "at no time, either before beginning construction of said house or during its construction, did defendant Wisler take any steps whatsoever to inform himself of the nature, composition or quality of the earth upon which said house was being built." Nor did he attempt "to inform himself

whether the earth beneath the house he was building would support the weight of said house.''

The construction of the house was undertaken without soil inspection ''personally and through [Wisler's] agents, servants and employees,'' notwithstanding that the home was built ''for the purpose and with the intent of offering said house, when completed, for sale to the public generally.'' The trial court further found that ''inquiry would have readily disclosed that said building site was actually, in part, on filled land,'' and that ''soil tests, made by competent soil engineers, would have disclosed that said land was unfit for a building site because of the lack of compaction.''

It was found that the appearance of the land at the time it was purchased by Wisler was not such that ''reasonably prudent persons'' in his position would have been ''alerted to the existence of fill material in the site.'' But in the course of construction Wisler ''personally and also through one of his employees acting within the course and scope of his employment, excavated physically through and into the unstable and unsuitable earth to a depth of approximately 18 to 24 inches for the purpose of preparing foundation footings for said house.'' It was found ''that a reasonably prudent person under like or similar circumstances and as a result of making said excavations for foundation footings would have discovered'' the insufficient compaction of the underlying earth material, and ''would have caused soil tests and investigations to be made before proceeding with the building.'' The trial court specifically found that Wisler ''negligently failed to discover or notice the unsuitable nature of said ground and failed to cause such tests or investigations to be made.''

The house was completed prior to September 1955, and offered for sale to the public. It was not in any way built especially for the plaintiffs herein. The Sabellas moved in to the house in October 1955. No questions are instantly presented concerning any representations made to plaintiffs during the purchase transactions.

It appears that there were heavy rains during the early winter of 1955-1956, sufficient to cause a large quantity of earth and rock to break away from the rock cliff which rises immediately out of plaintiffs' rear lot area, and slide into their backyard and patio. However, apparently no appreciable earth failure or damage to the house from subsidence occurred that winter, or during the rainy seasons 1956-1957 or 1957-1958.

In May 1957 defendant National Union Fire Insurance Company issued to the Sabellas a fire insurance policy containing an " 'All Physical Loss' Building Endorsement." National Union thereby agreed to insure the house "against all risks of physical loss except as hereinafter excluded." Under the subdivision "Exclusions," it was stated: "This endorsement does not insure against *loss . . . by* termites or other insects; wear and tear; deterioration; smog; smoke from agricultural smudging or industrial operations; rust; wet or dry rot; mould; mechanical breakdown; *settling, cracking, shrinkage, or expansion of pavements, foundations, walls, floors, or ceilings; unless loss by . . . collapse of buildings ensues. . . .*" (Emphasis added.)

The trial court found that although "there was no appreciable damage to said house until approximately May 1st, 1959," sometime between November 1, 1958, and February 1, 1959, the sewer pipe from the house began to leak at a point near the house, causing the sewer outflow from the house to infiltrate the unstable earth near and below the foundation.[1] The court found "that the cause of said sewer pipe so breaking and leaking was either the settling and consolidation of the inadequately compacted fill material upon which it [the sewer pipe] was placed, or the improper closure of certain joints therein, or a combination of both these causes."

After the sewer had been emptying water near the foundation for at least three months, the house settled "to uneven elevations to such an extent that its foundations and walls cracked, its floors became no longer level and certain of its doors and windows could no longer be opened or closed. The house sank in many places, one part dropping over 7 inches. Subsidence at various points in most rooms ranged from 2 to 6 inches, although the dwelling remained inhabitable and did not collapse. The court found that but for the damage the reasonable market value of plaintiffs' home would be $18,200, but that its reasonable market value in the damaged condition was only $10,000.

In regard to the cause of the earth failure, the trial court made an express finding of fact that the water escaping from the break in the sewer line near the foundation "infiltrated into said unstable earth below said foundation, *causing it* [the earth] *to settle and consolidate with rapidity and causing*

---

[1]It would seem that a very considerable quantity of water thus flowed into the nearby earth. Mr. and Mrs. Sabella lived in and used the facilities of the house, and they had two young children.

*plaintiff's house thereon to settle to uneven elevations.''*
(Emphasis added.) The court also stated, among its findings
concerning the cause of action against defendant National
Union, ''That it is the nature of uncompacted fills such as that
on which plaintiffs' dwelling was constructed to settle, and that
the uncompacted fill settled as the natural result of its own
weight, the weight of plaintiffs' dwelling thereon and the
induction of waste water from a broken house lateral sewer.''

In order to be consistent with the finding hereinbefore set
forth that the induction of waste water was the cause of the
subsidence of the foundation, the finding next above must be
interpreted to state that it is the nature of uncompacted fills
to settle as the result of their own weight and the weight of
objects thereon such as a dwelling and its appurtenances, but
that the above factors resulting in potential weakness in the
supportive earth were triggered to act by the induction of the
waste water from the house, causing rapid earth compaction
and subsidence. In this connection it must be noted that the
Sabellas' home suffered no appreciable damage until the end
of the fourth rainy season, which included the landslide-
causing rains in the winter of 1955-1956. It would not seem
unreasonable to infer that but for the break in the sewer line,
the virtual absence of subsidence damage might have con-
tinued for some time.

The trial court further found that the process of earth com-
paction and resultant damage to the house continued from May
1, 1959, until the date of judgment (October 10, 1960) ; that
such damage ''is reasonably certain to continue in the future
for an indefinite period of time'' until the earth is adequately
compacted by natural or artificial means, and ''that the said
process and the damage accruing therefrom was and is the
direct and proximate result of the negligence of defendant
Wisler.''

### The Homeowners' Cause Against the Builder

Appellant Wisler initially contends that the judgment
as to his liability should be reversed since he was not found
to be chargeable with misrepresentation or fraudulent conceal-
ment, and he is thus protected by the doctrine of caveat emptor
as applied to real property. However, since Wisler's liability
is predicated solely upon negligence in the construction of
the dwelling, rather than upon alleged misrepresentation or
any implied warranty, it does not appear that the doctrine of
caveat emptor has any application to the instant action. (See

*Ferguson* v. *Koch*, 204 Cal. 342, 345 [268 P. 342, 58 A.L.R. 1176] ; 8 Thompson, Real Property (1940) § 4599.)

That defendant Wisler is liable to the homeowners herein for his negligence in constructing the dwelling upon an improperly compacted lot follows from our holding in *Stewart* v. *Cox*, 55 Cal.2d 857, 860, 863 [13 Cal.Rptr. 521, 362 P.2d 345]. In the *Stewart* case a subcontractor who negligently installed the gunite concrete material· in a swimming pool, causing water to escape which damaged the swimming pool itself, the surrounding yard, and the house, was held liable for the homeowners' damages. We stated in *Stewart* that whether in a specific situation a defendant will be held liable for negligence causing harm to the property of another "is a matter of policy and involves the balancing of various factors, among which are the extent to which the transaction was intended to affect the plaintiff, the foreseeability of harm to him, the degree of certainty that he suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, and the policy of preventing future harm." (55 Cal.2d at p. 863.)

 Applying the foregoing principles to the instant situation, it appears that while this house was not constructed with the intention of ownership passing to these particular plaintiffs, the Sabellas are members of the class of prospective home buyers for which Wisler admittedly built the dwelling. Thus as a matter of legal effect the home may be considered to have been intended for the plaintiffs, and Wisler owed them a duty of care in construction. (See Prosser, Torts (2d ed. 1955) § 36, pp. 166-168.) It is apparent that harm was foreseeable to prospective owners when the home was constructed upon the inadequately compacted earth in the lot, and it is undisputed that the Sabellas' home was seriously damaged. Also, there was found to be a close connection between the negligent elements of workmanship for which defendant contractor must be held responsible, including the placement of the foundation of the house upon loose fill, the laying of the sewer pipe upon an insufficiently firm footing plus the possible improper closure of certain joints in that pipe, and the injury suffered. As the general contractor Wisler is held responsible for the defectively laid plumbing even though the work might have been completed by a subcontractor. (*Dow* v. *Holly Manufacturing Co.*, 49 Cal.2d 720, 725-728 [321 P.2d 736].) The trial court expressly found that the defective plumbing installation permitted the water infiltration which in turn caused the rapid

consolidation of the unstable earth, leading to the damage to the dwelling. Finally, the prevention of future negligent construction of buildings upon insufficiently supportive material would not be furthered by exempting defendant Wisler from liability for his negligence. (See *Biakanja* v. *Irving*, 49 Cal.2d 647, 651 [320 P.2d 16, 65 A.L.R.2d 1358] ; see also *Buist* v. *C. Dudley De Velbiss Corp.*, 182 Cal.App.2d 325, 329 [6 Cal. Rptr. 259].)

Defendant Wisler attempts to distinguish the instant factual situation from that in *Stewart* v. *Cox, supra*, 55 Cal.2d 857, in that damage to property other than the swimming pool there involved was foreseeable, and he argues that the only harm foreseeable herein was damage to the house itself. But the plaintiffs in the Stewart case recovered for damages to the swimming pool as well as for the damaged surrounding property. (See 55 Cal.2d at pp. 860, 866-867.) Also, in *Bausé* v. *Anthony Pools, Inc.*, 205 Cal.App.2d 606, 609-610 [23 Cal. Rptr. 265], the plaintiff property owner recovered damages from the defendant contractor for the full cost of reconstructing a swimming pool that was improperly made and not usable, and one of the successful theories of recovery was that " 'defendant designed and construed [the swimming pool] in a careless and negligent manner.' " Moreover, we indicated in the *Stewart* case that the liability of a contractor should be determined by the consideration and weighing of the various factors bearing upon liability hereinbefore discussed, rather than by resort to special rules or distinctions. (See 55 Cal.2d at p. 863.)

A further contention by the contractor is that imposition upon him of liability for his negligence in construction is contrary to the holding in *Wyatt* v. *Cadillac Motor Car Division*, 145 Cal.App.2d 423, 426 [302 P.2d 665]. In the *Wyatt* case an automobile manufacturer was held exempt from liability to the purchaser of an automobile for the negligent placement of an obstruction within the motor, causing ruin of the engine. It was there stated: "[D]efendant's duty was confined to the exercise of reasonable care to see that the car was so manufactured and assembled as to be free from defects which might be reasonably expected to produce *bodily injury or damage to other property*." (Emphasis added.) (145 Cal. App.2d at p. 426.) A result similar to that in *Wyatt* was reached in *Fentress* v. *Van Etta Motors*, 157 Cal.App.2d Supp. 863, 866 [323 P.2d 227], where it was additionally held that in order for liability to be imposed an accident must have

resulted "involving some violence or collision with external objects." However, the *Wyatt* and *Fentress* cases must be deemed inconsistent with *Stewart* v. *Cox, supra,* 55 Cal.2d 857, 861-863, and hence disapproved, to any extent that those cases might be applied to contractors as distinguished from conventional manufacturers of goods. As noted above, the plaintiffs in *Stewart* recovered for damages to the swimming pool itself, the "manufactured" article there involved, and no violent accident occurred. (See 55 Cal.2d at p. 860, 866-867; Civ. Code, § 1714; .see also 32 N.Y.U.L.Rev. 197, 200, 202-203; 69 Yale L.J. 1099, 1102-1103.)

Defendant Wisler's final contention is that if the judgment against him is allowed to stand, builders of structures will be liable to the original purchaser and to subsequent owners for any and all deterioration in the structures attributable to negligent workmanship. However, imposition of liability upon Wisler for his negligence resulting in the fundamental defect here involved, causing reduction in the value of the house by nearly 50 per cent, does not necessarily presage a contractor's liability for any and all imaginable defects in construction.

### The Homeowners' Action Against the Insurer

The Sabellas, as appellants, contend that the rapid and severe damage which occurred to their home was not the result of "settling" within the terms of the exclusion in their policy. As hereinbefore set forth, the policy excluded coverage for loss by termites, wear and tear, and other causes such as mould. Following enumeration of the latter excluded perils, the following clause appeared excepting: "settling, cracking, shrinkage, or expansion of pavements, foundations, walls, floors, or ceilings; [unless collapse ensues]."

But it appears that an ordinary individual surveying the instant damage could properly conclude that the house "settled," so that placement of the word "settling" in the exclusion clause would convey to the ordinary person reading the policy exceptions (*Prickett* v. *Royal Ins. Co. Ltd.,* 56 Cal. 2d 234, 238 [14 Cal.Rptr. 675, 363 P.2d 907]), the meaning that the type of subsidence loss herein was meant to be excluded from coverage. It should be noted that the understanding as to non-coverage here relevant is that of the ordinary purchaser of insurance, desirous of knowing what he is getting for his money. (*Ransom* v. *Penn Mutual Life Ins. Co.,* 43 Cal.2d 420, 424-425 [274 P.2d 633] ; *Pacific etc. Co.* v. *Williamsburgh City Fire Ins. Co.,* 158 Cal. 367, 375 [111 P.

4].) While somewhat more clarity of statement might be desirable from the standpoint of the average lay purchaser of insurance, it would appear that the present exception was sufficiently understandable by an ordinary reader.

Furthermore, defendant National Union correctly argues that the insurance contract excluded with sufficient clarity all loss by settling, whether gradual or rapid, unless collapse of the dwelling ensued, and since the house remained usable and continued to be occupied, it cannot be said that any "collapse" occurred. Thus the case at bar is not a proper one for application of the rule advanced by plaintiffs that " '[P]rovisos and exceptions must be strictly construed against the insurer, who is bound to use such language as to make the conditions, specifications and provisions thereof clear to the ordinary mind, and in case it fails to do so any ambiguity or reasonable doubt must be resolved in favor of the assured.' " (*Prickett* v. *Royal Ins. Co. Ltd.*, *supra*, 56 Cal.2d 234, 237.)

Respondent National Union additionally contends that the reasoning in *Prickett* v. *Royal Ins. Co. Ltd.*, *supra*, 56 Cal.2d 234, indicates that the instant policy exclusion should be deemed to encompass the damage herein. In *Prickett*, the policy excluded coverage for "normal settling," and we held that the sudden drop of up to 12 inches of portions of a house due to improperly compacted fill beneath the house was not "normal settling" within the terms of that policy. (See 56 Cal.2d at p. 238.) But since the instant policy excludes merely "settling," without use of qualifying adjectives such as "normal" or "usual," the policy herein does indicate an intent to exclude any and all loss caused by settling, and settling did occur herein.

Plaintiff Sabellas alternatively and correctly argue, however, that defendant National Union is liable because the rupture of the sewer line attributable to the negligence of a third party, rather than settling, was the efficient proximate cause of the loss. The policy excepted *loss by settling*, and the findings of the court below indicate that the broken sewer line emptied waste water into the loose fill, setting in motion the forces tending toward settlement. As stated in 6 Couch, Insurance (1930) § 1466, "[I]n determining whether a loss is within an exception in a policy, where there is a concurrence of different causes, the efficient cause—the one that sets others in motion—is the cause to which the loss is to be attributed, though the other causes may follow it, and operate

more immediately in producing the disaster.'' The virtual absence of subsidence damage in the prior four years of the existence of the house here in question clearly indicates that the broken pipe was the predominating or moving efficient cause of the loss. (See 6 Couch, Insurance (1930) § 1463, p. 5298.)

While defendant National Union contends that the trial court made a finding of fact ''that the proximate cause of said loss was settling,'' the above finding was made as a part of the following conclusion of law: ''That the cause of loss and damage to plaintiffs' dwelling is excluded by the terms of the policy of insurance issued by defendant National, in that the proximate cause of said loss was settling.'' But the latter conclusion by the trial court concerning the proximate cause of the loss is not binding upon this court on the instant judgment roll appeal, since where the facts on appeal are settled or not in dispute, the determination of proximate cause becomes a question of law. (*Burdette* v. *Rollefson Const. Co.*, 52 Cal.2d 720, 726 [344 P.2d 307]; *Stasulat* v. *Pacific Gas & Elec. Co.*, 8 Cal.2d 631, 638 [67 P.2d 678].)

The instant problem in proximate causation is similar in principle to that in *Brooks* v. *Metropolitan Life Ins. Co.*, 27 Cal.2d 305 [163 P.2d 689], wherein recovery was allowed on a policy insuring against death by accidental means where the insured, while suffering from incurable cancer, an excluded peril, died in a fire. It was there stated: '' [R]ecovery may be had even though a diseased or infirm condition appears to actually contribute to cause the death if the accident sets in progress the chain of events leading directly to death, or if it is the prime or moving cause.'' (27 Cal.2d at pp. 309-310.) Similarly, in *Hanna* v. *Interstate Business Men's Acc. Assn.*, 41 Cal.App. 308 [182 P. 771], recovery was allowed on a policy covering death from external or violent means, but limiting recovery for hernia injuries, where a blow on the chest caused a hernia resulting in death. The court held that under the established rules governing proximate causation as applied to insurance cases, ''the hernia must be regarded as the result of the accident, and the accident itself, and not the resultant hernia, as the cause of the death.'' (41 Cal.App. at p. 310; see Note 108 A.L.R. 6.) Also relevant is *Norwich Union Fire Ins. Soc.* v. *Board of Commissioners* (1944) 141 F.2d 600, where corn in storage was insured against loss by fire but not against loss by deterioration. A fire destroyed the machinery necessary to air the corn

and so prevent its deterioration, and the corn decayed from inherent natural causes. It was held that the fire was the proximate cause of the loss of the corn, even though the excepted peril of deterioration immediately caused the loss. (141 F.2d at p. 602; see *Edgerton & Sons, Inc.* v. *Minneapolis Fire & Marine Ins. Co.* (1955) 142 Conn. 669, 673-674 [116 A.2d 514] [policy covers though excluded peril immediately brings about damage, where the operation of the excluded peril is caused by a peril insured against] ; *Princess Garment Co.* v. *Fireman's Fund Ins. Co.* (1940) 115 F.2d 380, 383 [recovery allowed where peril insured against causes the action of an excepted peril resulting in loss].)

Defendant insurer attempts to establish its non-liability by reliance upon section 532 of the Insurance Code, which states that "If a peril is specially excepted in a contract of insurance and there is a loss which would not have occurred but for such peril, such loss is thereby excepted even though the immediate cause of the loss was a peril which was not excepted." The insurer's argument is that since in a factual sense the loss herein would not have occurred "but for" the settling of the underlying earth and house, the plaintiffs are thereby exempt from coverage for this loss. But section 532 must be read in conjunction with related section 530 of the Insurance Code (*Pacific etc. Co.* v. *Williamsburgh City Fire Ins. Co., supra,* 158 Cal. 367, 372), and section 530 provides that "An insurer is liable for a loss of which a peril insured against was the proximate cause, although a peril not contemplated by the contract may have been a remote cause of the loss; but he is not liable for a loss of which the peril insured against was only a remote cause." It is thus apparent that if section 532 were construed in the manner contended for by defendant insurer, where an excepted peril operated to any extent in the chain of causation so that the resulting harm would not have occurred "but for" the excepted peril's operation, the insurer would be exempt even though an insured peril was the proximate cause of the loss. Such a result would be directly contrary to the provision in section 530, in accordance with the general rule, for liability of the insurer where the peril insured against proximately resulted in the loss (See 6 Couch, Insurance (1930) § 1464.)

It would appear therefore that the specially excepted peril alluded to in section 532 as that "but for" which the loss would not have occurred, is the peril proximately causing the

loss (see *Herron* v. *Smith Bros., Inc.*, 116 Cal.App. 518, 521 [1] [2 P.2d 1012]), and the peril there referred to as the "immediate cause of the loss" is that which is immediate in time to the occurrence of the damage. (See Black's Law Dictionary (4th ed. 1951) "Immediate Cause," p. 884; 6 Couch, Insurance (1930) § 1463, pp. 5298-5299; 28 Cal.Jur.2d, Insurance, § 446, pp. 160-161.) The latter conclusion as to the meaning of section 532 of the Insurance Code suggests disapproval of language to the contrary in *Hughes* v. *Potomac Ins. Co.*, 199 Cal.App.2d 239, 245 [4] [18 Cal.Rptr. 650], wherein the "but for" provision of section 532 was interpreted to refer to a cause without which the loss would not in fact have occurred, and without reference to companion section 530 of the Insurance Code.

 A further contention by respondent National Union is that since the insurance coverage herein extended to the underlying lot area (see *Hughes* v. *Potomac Ins. Co., supra,* 199 Cal.App.2d 239, 245-249), and since the damage occurred as the result of operation of forces inherent in the uncompacted fill and the defective workmanship in the installation of the sewer outflow, it was inevitable that the damage herein would have occurred to the house at some time. It is argued that the loss was not fortuitous, and hence not a "risk" properly the subject of insurance. (See 2 Richards, Insurance (5th ed. 1952) p. 710.) However, it is provided in section 250 of the Insurance Code, as instantly relevant, that "any contingent or unknown event" may be insured against, and it was recently stated in *Snapp* v. *State Farm Fire & Cas. Co.*, 206 Cal. App.2d 827, 830 [24 Cal.Rptr. 44], on facts also involving movement of an uncompacted fill, that: " [A]fter any movement of land has occurred it might be said to have been 'inevitable' with semantic correctness, but such 'inevitability' does not alter the fact that at the time the contract of insurance was entered into, the event was only a *contingency* or *risk* that might or might not occur within the term of the policy." Moreover, the breaking of the sewer pipe and consequent induction of quantities of waste water into the improperly compacted fill may be viewed as an unanticipated external event or casualty, operating to trigger the greatly accelerated action of possibly inherent vices. (Compare with *Chute* v. *North River Ins. Co.* (1927) 172 Minn. 13, 14-15 [214 N.W. 473, 55 A.L.R. 938].)

The judgment is affirmed as to defendant-contractor Wisler

and is reversed as to defendant National Union, and the cause remanded for a new trial as to defendant insurer's liability in accordance with the views herein expressed.

Gibson, C. J., Traynor, J., Schauer, J., Peters, J., and Tobriner, J., concurred.