CHEMSTAR, INC., Plaintiff,

v.

LIBERTY MUTUAL INSURANCE CO., et al., Defendants.

No. CV90–2904–HLH (Bx).

United States District Court, C.D. California.

July 23, 1992.
As Modified July 31, 1992.

Ronald M. Oster, Michael E. Kohn, Robert L. Meylan, Paul, Hastings, Janofsky & Walker, Los Angeles, Cal., for plaintiff Chemstar, Inc.

Thomas D. Long, E. George Joseph, Leigh M. Leonard, Nossaman, Guthner, Knox & Elliott, Los Angeles, Cal., for Genstar Corp.

Gerald V. Weigle, Jr., David H. Beaver, Robert R. Furnier, Brian S. Sullivan, Paula S. Welker, Dinsmore & Shohl, Cincinnati, Ohio, Ronald J. Skocypec, Jeffrey A. Lewiston, Grace, Skocypec, Cosgrove & Schirm, Los Angeles, Cal., Michael J. Brady, Ropers, Majeski, Mohn, Bentley, Wagner & Kane, Redwood City, Cal., for Liberty Mut. Ins. Co.

Bradford H. Miller, Gregory M. Heuser, Murtaugh, Miller, Meyer & Nelson, Orange, Cal., for National Union Fire Ins. Co. of Pittsburgh, Pa.

Roger E. Marken, Ives, Kirwan & Dibble, Los Angeles, Cal., for Industrial Ins. Co. of Hawaii, Ltd.

Brian F. Zimmerman, Dee–Ann Jenkins, Zimmerman & Kahanowitch, Encino, Cal., for American Home Assur. Co.

Paul R. Fine, Daniels, Baratta & Fine, Los Angeles, Cal., for Employers Ins. of Wausau.

William A. Kurlander, Gail E. Cohen, Dietmar A. Grellmann, Barger & Wolen, Los Angeles, Cal., for United Ins. Co.

## ORDER GRANTING SUMMARY JUDGMENT

HUPP, District Judge.

These motions for summary judgment on the "occurrence" and "trigger" issues were submitted on May 4, 1992 and are now determined as set forth below.

### BACKGROUND

On March 13, 1990, Plaintiff Chemstar, Inc. ("Chemstar") filed this action in Los Angeles Superior Court, alleging breach of contract and violation of the covenant of good faith and fair dealing against defendants Liberty Mutual Insurance Company ("Liberty"), National Union Fire Insurance Company of Pittsburgh, PA ("National"), and Industrial Insurance Company of Hawaii, Ltd. ("Industrial"). Liberty removed the action to this Court on the basis of diversity jurisdiction. In November 1990, Liberty filed a third party claim against Genstar Corporation ("Genstar"). Subsequently, three more insurance companies— American Home Assurance Company ("American"), Employers Insurance of Wausau ("Wausau"), and United Insurance Company ("United")—were drawn into the action through third-party claims. During the course of the litigation, the parties have asserted numerous counterclaims, cross-claims, and third-party claims against one another.

The action arises from 28 property damage claims asserted by Southern California homeowners against Chemstar from 1985 to 1988. The homeowners brought their claims when the plaster on their interior walls pitted, leaving unsightly blemishes. During the period in which the claims arose, Chemstar was covered under various comprehensive public liability policies issued by several primary and excess insurers. There were two primary insurers: Liberty (March 14, 1984 to December 5, 1986)[1] and National (December 5, 1986 to

---

1. These were "blanket public liability" policies numbered RG1–621–004110–414, RG1–621– 004110–415, and RG1–621–004110–416.

October 1, 1988).[2] In addition, there were four excess insurers: American (March 15, 1984 to April 15, 1986),[3] Wausau (March 15, 1985 to March 15, 1986),[4] Industrial (December 4, 1986 to December 4, 1987),[5] and United (April 15, 1986 to April 15, 1987).[6] Chemstar alleges these insurers owe it a duty to defend and indemnify against the 28 plaster-pitting claims.

Trial of this action has been bifurcated. The first phase addressed Liberty's duty to defend Chemstar. By summary judgment, the Court determined that Liberty owed Chemstar a duty to defend all claims because of Liberty's potential liability under its policies. Following trial, the jury determined that Liberty breached its duty to defend and violated the covenant of good faith and fair dealing, and it awarded Chemstar compensatory and punitive damages totaling approximately $16.8 million. Following the jury verdict, the Court denied Liberty's motions for judgment notwithstanding the verdict, new trial, and remittitur of damages.

The second phase of the trial addresses indemnification issues and the allocation of defense costs among the various insurers. Currently, the parties bring cross-motions for summary judgment regarding two indemnification issues: (1) the number of "occurrences" for the purpose of applying per occurrence limits on liability, and (2) the number and timing of "triggers" of coverage for the purpose of determining which insurers must cover the plaster-pitting claims. As set forth more fully below, the Court holds that all of the 28 plaster-pitting claims arose from a single "occurrence" and that there was a single "trigger" of coverage upon first manifestation of the plaster-pitting. In addition, National moves for summary judgment as to Chem-star's contribution claim for defense costs. The Court grants this motion, although not on the grounds asserted by National.

### FACTS

The following material facts are undisputed. All the plaster used in the 28 damaged homes contained "Type S" lime supplied by Chemstar's predecessor, Genstar Lime Company, Inc. ("GLC").[7] The plaster pitted because GLC's "Type S" lime contained excessive amounts of magnesium oxide pellets, also called "periclase," an unstable substance that expands when it reacts with water. When lime is manufactured, periclase is usually forced to react with water during the "hydration" process. Periclase that hydrates completely turns into magnesium hydroxide, a stable substance. However, periclase that does not hydrate completely will continue to react with moisture contained in the air until it changes into stable magnesium hydroxide.

In this instance, lime tainted with excessive amounts of periclase was used to make interior plaster, which was installed in numerous homes. Over time, the periclase absorbed air moisture, reacting more quickly in warmer, more humid homes. As it changed into magnesium hydroxide, the periclase expanded and, in the case of the 28 damaged homes, popped through the smooth plaster finish of the interior walls, causing unsightly pits. Two important facts about the plaster-pitting must be stressed. First, plaster-pitting was not inevitable in every home where periclase-tainted plaster was installed. Rather, pitting occurred only where the periclase pellets were so large, numerous and close to the plaster surface that their expansion created sufficient force to burst through the plaster surface. Second, plaster-pitting

---

2. These were "comprehensive general liability" policies numbered GL–1169322 and GL–1169352.

3. Policy number 920–91–36 covered the period March 15, 1984 to March 15, 1985, and policy number 920–91–88 covered the period March 15, 1985 to April 15, 1986.

4. Policy number 2736–00–570240.

5. Policy number JU–895–2711.

6. Policy number 157122.

7. GLC was a subsidiary of Flintkote Company, which was a subsidiary of Genstar Corporation. Chemstar acquired GLC through a Stock Purchase Agreement with Flintkote Company dated December 4, 1986.

is a type of cosmetic rather than structural damage, since it does not affect the stability or soundness of the homes themselves.

All the periclase-tainted lime used in the 28 homes was manufactured at GLC's Apex quarry in Nevada and sold during the period from 1984 to 1986. The source of the periclase is attributable to several manufacturing problems, including overburning of the lime, improper mining techniques, and "scaling," where residue from the kiln walls breaks free and falls into the lime. It is not accurate to call all periclase-tainted lime simply "defective." Rather, depending upon the amount of periclase it contains, lime is defective *for certain purposes.* For instance, lime with high periclase concentrations is fit for outdoor use, such as stucco exteriors, where pitting will go unnoticed. By contrast, only lime with low periclase concentrations is fit for indoor use, where pitting will disfigure the smooth plaster finish.

In most cases, therefore, a lime manufacturer could avoid causing property damage with proper labeling, and indeed GLC attempted to do so through a quality control and distribution system. When this system worked properly, lime was tested to determine its periclase concentration. Then lime with low periclase concentrations was sold to "sensitive" customers who used it for interior plaster, while lime with high periclase concentrations was sold to customers who used it for exterior stucco.

This quality control system was informal, using few written records and relying heavily on the good memories of GLC's employees. Moreover, although lime was packaged in fifty pound bags, the bags themselves did not carry warnings; instead, when lime with high periclase concentrations was sold, the bill of lading was marked "for exterior use only." Thus, although GLC's direct purchaser might be aware of the lime's proper use, the ultimate user might not. Consequently, it was almost inevitable that some lime with high

periclase concentrations would be used indoors, and it was.

GLC was a subsidiary of a subsidiary of Genstar, whose Liberty primary policy covered Genstar and its subsidiaries, including GLC. The stock of GLC was sold to Chemstar effective on December 6, 1986, at which time GLC and Chemstar were merged to become the same corporate entity. Liberty terminated its policy as to GLC on the sale date. The court has previously held on summary judgment that the effect of these transactions is that Liberty owed Chemstar a duty to defend all of the plaster claims because of the potential for coverage under the Liberty policies.

## ANALYSIS

### I. *Standard for Summary Judgment*

■ Summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Further, under California law, interpretation of an insurance policy is a matter of law if no conflicting extrinsic evidence exists. *Stearns v. Title Ins. & Trust Co.,* 18 Cal.App.3d 162, 166, 95 Cal.Rptr. 682 (4th Dist.1971). Here, the material facts are undisputed and interpretation of the policies does not depend on extrinsic evidence. Accordingly, the Court may interpret the terms of the policies and apply them to the undisputed facts of the case as a matter of law.

### II. *Occurrence*

Each of the policies at issue limits the insurer's liability to a "per occurrence" amount.[8] Determining the number of "occurrences" for the purpose of applying the per occurrence limits raises two questions: (1) How should "occurrence" be defined? (2) How does that definition apply to the undisputed facts of this case?

---

8. Liberty had a $2 million per occurrence limit; National, a $1 million limit; American, either a $3 million (March 15, 1984 to March 15, 1985) or $5 million (March 15, 1985 to April 15, 1986) limit; Wausau, a $5 million limit; Industrial, a $1 million limit; and United, a $5 million limit.

### A. Definition of Occurrence

■ For the purpose of applying per occurrence limits, courts have defined "occurrence" in three ways. See generally *What Constitutes Single Accident or Occurrence Within Liability Policy Limiting Insurer's Liability to a Specified Amount Per Accident or Occurrence?*, 64 A.L.R.4th 668 (1988). A majority of courts determines the number of occurrences based on the underlying cause of the property damage. *Id.* at 673, 676–77. By contrast, a minority of courts determines the number of occurrences based either on the effect of the accident or the event that triggers liability. *Id.* at 673–74, 679–80.

The California courts[9] have addressed this issue in only two cases, both of which adopt the majority causation rule. In *Hyer v. Inter-Insurance Exchange of Auto. Club*, 77 Cal.App. 343, 246 P. 1055 (1926), where the insured's car collided with one car, deflected sideways, and collided with a second car, the California appellate court held that both collisions comprised one accident because they arose from a single proximate cause. *Accord Perkins v. Fireman's Fund Indem. Co.*, 44 Cal.App.2d 427, 112 P.2d 670 (1941) (holding insurer liable only up to $10,000 per accident limit even though several people injured in auto accident).

Although the California courts have not defined "occurrence" in the context of public liability policies, numerous other courts have done so, and they adopt the causation rule apparently without exception. *See, e.g., Appalachian Ins. Co. v. Liberty Mutual Ins. Co.*, 676 F.2d 56, 61 (3d Cir.1982) (single occurrence where discriminatory policies led to multiple employment discrimination claims); *Champion International Corp. v. Continental Casualty Co.*, 546 F.2d 502, 505–06 (2d Cir.1976), *cert. denied*, 434 U.S. 819, 98 S.Ct. 59, 54 L.Ed.2d 75 (1977) (claims for defective paneling install-ed in 1400 vehicles arose from single occurrence—the sale of the paneling); *Air Products & Chemicals, Inc. v. Hartford Acci. & Indem. Co.*, 707 F.Supp. 762, 772–73 (E.D.Pa.1989) (single occurrence where multiple injuries resulted from insured's manufacture and sale of asbestos and welding products); *Cargill, Inc. v. Liberty Mut. Ins. Co.*, 488 F.Supp. 49, 53 (D.Minn.1979), *aff'd*, 621 F.2d 275 (8th Cir.1980) (numerous batches of defective antibiotic arose from single occurrence—formula change in nutrient medium).

Moreover, in the current case, the terms of the policies at issue support the causation rule. For instance, Liberty's 1986–87 policy defines occurrence as "a continuous or repeated exposure to conditions which *results in* ... 'property damage,'" and its 1984–85 policy defines occurrence as follows:

> "For the purpose of determining the limit of the Company's liability, all ... property damage *arising out of* continuous or repeated exposure to substantially the same general conditions shall be considered as *arising out of* one occurrence."

(emphasis added). Similarly, National's policies define occurrence as "an accident, including continuous or repeated exposure to conditions, which *results in* ... property damage" (emphasis added). Likewise, American's policies, which were incorporated into Wausau's policies, cover property damage *"caused by or arising from* an occurrence" (emphasis added).[10]

Thus, in all of these policies, either the occurrence "results in" property damage, or property damage is "caused by" or "arises from" the occurrence. Such terms denote a causal relationship between the "occurrence" and the "property damage," so the policies themselves define an "occurrence" as the underlying cause of property damage. Finding the causation rule supported by precedent and the terms of the

---

9. California law controls substantive issues in this diversity action. *See Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

10. The terms of all the policies at issue are substantially the same because the insurers have largely adopted the industry's standard Comprehensive General Liability policy form. None of the insurers argues that its policy contains a significantly different definition of "occurrence."

policies, the Court determines that an "occurrence" for purposes of applying per occurrence limits on liability is the underlying cause of the property damage.[11]

## B. *Application of the Causation Rule*

■ The parties have offered numerous theories regarding the underlying cause or causes of the 28 plaster-pitting claims. Chemstar argues the sole cause was GLC's use of the Apex quarry, where all of the lime with excessive periclase concentrations was manufactured. Genstar contends the sole cause was the mere presence of periclase in the lime. Liberty asserts the sole cause was the hydration of the periclase after the plaster was installed in the homes. National and Industrial maintain the sole cause was GLC's failure to warn that lime with high periclase concentrations should not be used for indoor use. And American, Wausau, and United identify multiple potential causes, including production defects, such as scaling, overburning, and improper mining techniques; handling by various wholesalers; installation by various laborers; and exposure to varying atmospheric conditions.

Based on the undisputed facts, however, it is determined that only one of these causation theories is viable: GLC's failure to take sufficient steps to warn the end users that lime with high periclase concentrations should not be used indoors. As the parties agree, lime containing periclase is not inherently defective. Rather, depending on the amount of periclase in the lime, it is defective only for certain uses. Thus, lime with high periclase concentrations is fit for outdoor use but not for indoor use because the pitting caused by periclase will disfigure the plaster on an interior wall but not the stucco on a exterior wall. Given this fact, the other suggested causes are irrelevant: Neither the presence of periclase, nor its hydration following installation, nor the use of the Apex quarry, nor the various production defects, nor the handling of the lime by various wholesalers and laborers, would have caused the homeowners' property damage if the lime had not been sold for indoor use or had carried the warning "for exterior use only." Accordingly, the Court determines the underlying cause of the 28 plaster-pitting claims was GLC's failure sufficiently to warn that lime with high periclase concentrations should not be used for indoor use.

■ Once the underlying cause is identified, it remains to be decided whether this cause constitutes one or more occurrences, in light of the fact that multiple batches of periclase-tainted lime were manufactured and sold from 1984 to 1986. The policies at

11. Although most of the insurers agree with this conclusion, two of the excess insurers, American and Wausau, suggest that the California courts define "occurrence" as the property damage itself, rather than its underlying cause. They rely on California cases holding that " '[t]he time of the occurrence of an accident within the meaning of an indemnity policy is not the time the wrongful act was committed, but the time when the complaining party was actually damaged.' " *Home Ins. Co. v. Landmark Ins. Co.,* 205 Cal.App.3d 1388, 1392, 253 Cal.Rptr. 277 (4th Dist.1988); *Hallmark Ins. Co. v. Superior Court,* 201 Cal.App.3d 1014, 1018, 247 Cal.Rptr. 638 (2d Dist.1988). In these cases, however, the courts were not defining "occurrence" for the purpose of applying per occurrence limits on liability. Rather, they were determining whether property damage "occurred" during the policy periods of one or more insurers, thus triggering liability. Hence, these cases addressed the issue of whether coverage under a particular policy was triggered, rather than how much coverage was available if the policy was

in fact triggered. These are two distinct questions to which different rules apply. *Compare Event as Occurring Within Period of Coverage of "Occurrence" and "Discovery" or "Claims Made" Liability Policies,* 37 A.L.R.4th 382 (1988), *with What Constitutes Single Accident,* 64 A.L.R.4th 668.

In addition, American and Wausau's theory is not supported by the terms of the policies. The policies cover property damage that occurs *during* the policy period, as long as it is caused by an occurrence, without regard to the date of the occurrence. *See, e.g.,* Liberty Policy (covering "damages because of injury to ... tangible property *during the policy period* ... caused by an occurrence"); National Policy (covering property damage that "occurs during the policy period" as long as it is "caused by an occurrence"); American Policy (covering "injury to or destruction of property during the policy period" if it is "unexpectedly cause[d]" by an occurrence). Thus, the policies distinguish "occurrence" from "property damage" and require only that the latter happen during the policy period.

issue answer this question. Each of the policies provides that a single occurrence may consist of "continuous or repeated exposure to substantially the same general conditions." This is a broad definition: Even *repeated* exposure to *multiple* conditions may constitute just one occurrence. Applying this definition of occurrence, the Ninth Circuit has held that even "an ongoing harmful condition may constitute a 'single occurrence.'" *Mead Reinsurance v. Granite State Ins. Co.*, 865 F.2d 992, 994 (9th Cir.1988). And numerous other courts concur. *See, e.g., Appalachian*, 676 F.2d 56 (one occurrence where discriminatory employment policies led to multiple sex discrimination claims); *Champion*, 546 F.2d 502 (one occurrence where defective vinyl-covered paneling was sold to 26 different manufacturers); *Air Products*, 707 F.Supp. 762 (one occurrence where sale of asbestos products from 1967 to 1979 caused bodily injury to numerous claimants); *Cargill*, 488 F.Supp. 49 (one occurrence where multiple sales of a nutrient medium led to multiple batches of defective antibiotics). *But see Michigan Chemical Corp. v. American Home Assur. Co.*, 728 F.2d 374 (6th Cir.1984); *Dow Chemical Co. v. Associated Indem. Corp.*, 727 F.Supp. 1524 (E.D.Mich.1989).

This broad definition of occurrence is not difficult to apply in this instance. Here, all of the plaster-pitting claims arose from "repeated exposure" to one "general condition"—a failure to warn that lime with high periclase concentrations should not be used indoors. Since the policies define such "repeated exposure" as a single occurrence, the Court concludes that all 28 plaster-pitting claims arose from a single occurrence.[12]

## II. *Trigger*

Each of the policies at issue covers property damage that occurs during the policy period.[13] Thus, coverage under the policies is "triggered" only if property damage occurs during the policy period. Determining the number and timing of coverage "triggers" raises two questions: (1) How should "trigger" be defined? (2) How does that definition apply to the undisputed facts of this case?

### A. *Definition of Trigger*

■ The California courts have repeatedly held that insurance policies are triggered when property damage actually occurs, rather than when some prior wrongful act is committed. *See, e.g., Hallmark*, 201 Cal.App.3d at 1018, 247 Cal.Rptr. 638. In latent defect cases, however, the date when property damage occurs is often difficult to pinpoint, and this difficulty has led to three different trigger rules.

■ First, most courts have adopted the "manifestation" trigger: Property damage occurs when the latent defect first manifests, and the insurer on the risk at the time of first manifestation is liable for the entire loss, even if the property damage progresses after the policy expires. *See Event as Occurring Within Period of Coverage of "Occurrence" and "Discovery" or "Claims Made" Liability Policies*, 37 A.L.R.4th 382, 391, 406 (1988). This trigger rule is advanced by Liberty, American, and Wausau.

---

**12.** American, Wausau, and United contend that even GLC's failure to warn does not constitute a single occurrence because it is not "one proximate, uninterrupted, and continuing cause," as the courts have defined occurrence. *See, e.g., Appalachian*, 676 F.2d at 61. However, the Court reaches the same result even under this definition of occurrence: GLC's failure to warn was a "continuing" cause that was not "interrupted" by any other cause. As noted before, if GLC had employed an adequate quality control system and warned of the proper uses of its product, the other "causes" offered by American, Wausau, and United would not have resulted in property damage.

**13.** For example, Liberty's 1984–85 and 1985–86 policies cover "damages because of injury to or loss ... or destruction of tangible property *during the policy period*," and its 1986–87 policy covers property damage "which occurs *during the policy period*." National's policy covers property damage "which occurs *during the policy period*." And American's policy, incorporated into Wausau's policy, covers occurrences that cause "injury to or destruction of property *during the policy period*."

■ Second, when exposure to the latent defect causes immediate damage, such as in asbestos bodily injury cases, a number of courts have adopted the "exposure" trigger: Property damage occurs upon first exposure to the damage-causing condition, and the insurer on the risk at the time of first exposure is liable for the entire loss, even if the damage progresses after the policy expires. *Id.* at 391, 404–06. This trigger rule is advanced by National and United.

■ Third, when exposure to the latent defect causes immediate, progressive damage, some courts have adopted a variant of the exposure trigger called the "continuous injury" trigger: Property damage occurs upon first exposure to the damage-causing condition, and every insurer on the risk from the time of first exposure until the time the property damage ceases is liable, with the loss equitably allocated among all liable insurers. *See, e.g., Montrose Chemical Corp. v. Admiral Ins.,* 3 Cal.App.4th 1511, 5 Cal.Rptr.2d 358 (2d Dist.1992). Since this matter was argued, the California Supreme Court has granted a hearing in the *Montrose* case; thus the case is not precedential authority for its proposition. This trigger rule is advanced by Chemstar.

While wrestling with this issue in property damage cases, the California courts have adopted both the manifestation trigger and the continuous injury trigger. The California Supreme Court put its stamp of approval on the manifestation theory in *Prudential–LMI Com. Insurance v. Superior Court,* 51 Cal.3d 674, 274 Cal.Rptr. 387, 798 P.2d 1230 (1990), though it carefully limited its holding to first-party insurance policies, unlike the policies at issue in this case. In *Prudential,* the insureds discovered a crack in the foundation of their apartment building apparently caused by the shifting of unstable soil sometime after 1982. Seeking indemnification, the insureds sued various insurers, including Prudential, whose policy expired in 1980. The Court held that coverage under Prudential's policy was precluded because the property damage occurred after the expiration of Prudential's policy.

■ In doing so, the Court specifically rejected the continuing injury trigger that had been adopted earlier by a California appellate court in *California Union Ins. Co. v. Landmark Ins. Co.,* 145 Cal.App.3d 462, 193 Cal.Rptr. 461 (2d Dist.1983). According to the Court, trigger rules that focus on exposure to the damage-causing condition are useful only in special circumstances such as asbestos cases, where bodily injury (scarring of lung tissue) occurs immediately upon exposure to the asbestos. *Prudential,* 51 Cal.3d at 698, 274 Cal.Rptr. 387. By contrast, in property damage cases, damage usually occurs only when the latent defect actually manifests. *Id.* In addition, the Court criticized the *California Union* court's method of allocating damages among all insurers on the risk from the time of first exposure to the time damage ceases. According to the Court, such an allocation conflicts with the loss-in-progress rule, since even an insurer that issues a policy *after* the loss is known must cover a portion of the loss. *Id.* at 699, 274 Cal.Rptr. 387.

Consequently, the Court adopted the manifestation trigger: In first party progressive property loss cases, "the carrier insuring the property at the time of manifestation of property damage is solely responsible for indemnification once coverage is found to exist." *Id.* at 678–79, 274 Cal. Rptr. 387. The Court determined that property damage manifests at "that point in time when appreciable damage occurs and is or should be known to the insured." *Id.* at 699, 274 Cal.Rptr. 387. In so holding, the Court emphasized that the manifestation trigger is supported by sound policy: It creates greater certainty for insurers, thus lowering the cost of insurance, and it satisfies the reasonable expectations of insureds, since they are guaranteed coverage for manifested property damage even if it progresses after a policy expires. *Id.* at 699, 274 Cal.Rptr. 387. *Accord Home,* 205 Cal.App.3d 1388, 253 Cal.Rptr. 277.

Shortly before the Supreme Court decided *Prudential,* a California appellate court adopted the manifestation trigger in a third-party insurance case, *Fireman's Fund Ins. Co. v. Aetna Cas. & Sur. Co.,* 223 Cal.App.3d 1621, 273 Cal.Rptr. 431 (4th Dist.1990). Here, the insured, a construction company, was hired to restore a hotel. While working on the hotel's facade, the insured's subcontractor used the wrong patching compound, which led to spalling that first manifested during Fireman's Fund's policy period and progressed during Aetna's policy period. Deciding which policy covered the loss, the appellate court adopted the manifestation trigger, which had earlier been adopted in the first-party context in *Home,* 205 Cal.App.3d 1388, 253 Cal.Rptr. 277. The appellate court saw no reason to distinguish between first-party and third-party cases when the trigger merely allocated losses between insurers. *Fireman's Fund,* 223 Cal.App.3d at 1627–28, 273 Cal.Rptr. 431. Accordingly, the appellate court affirmed summary judgment in favor of Aetna, holding that Fireman's Fund, the insurer on the risk when the damage first manifested, was solely liable for the property damage.

Even more recently, a California appellate court again applied the manifestation trigger in a third-party insurance case in *Pines of La Jolla v. Industrial Indemn.,* 5 Cal.App.4th 714, 7 Cal.Rptr.2d 53 (4th Dist. 1992). Here, the insureds, developers of a condominium project, were responsible for various latent construction defects in the project that ultimately led to property damage. Evidence indicated that the damage may have first manifested during Industrial's policy period, though it progressed during Fireman's Fund's policy period. The appellate court held that Industrial would be liable for all damages that first mani-fested during its policy period: "[O]nce the contingency insured against (i.e., the damage occurring during the policy period) has materialized, the courts have held that the insurer is liable for all losses connected therewith, even though the damage may continue to grow after the policy has lapsed." 5 Cal.App.4th 714, 7 Cal.Rptr.2d at 56–57.

By contrast, it appears the continuous injury trigger has been adopted by just two California appellate courts, only one of them a third-party case. In the third-party case, *Montrose,* 3 Cal.App.4th 1511, 5 Cal. Rptr.2d 358, the court declined to follow the manifestation theory of *Prudential,* but adopted a "continuous trigger" system where all insurers on the risk from first exposure to the damage-causing condition must indemnify. However, the significance of this holding as precedent disappeared with the granting of a hearing by the Supreme Court, leaving only the theory behind to argue. *See also California Union,* 145 Cal.App.3d 462, 193 Cal.Rptr. 461 (applying the continuous injury trigger in a first-party case).

Although the California cases are divided, the Court determines that the California Supreme Court would likely adopt the manifestation trigger in this case. Here, property damage did not occur upon first exposure to the periclase-tainted lime. On the contrary, it is undisputed that plaster-pitting never occurred in some homes despite the presence of periclase-tainted lime; rather, pitting occurred only where the periclase pellets were sufficiently large, numerous and close to the plaster surface. Further, since the plaster-pitting was cosmetic rather than structural damage, no damage occurred until the pitting manifested, thereby disfiguring the plaster.[14] For

**14.** To refute this fact, United offers the expert testimony of Harry E. Rourke, who declared, "The use of Type S lime without [hydration] in this case caused the lime to begin damaging the plaster in the homes shortly after the plaster was installed. Initially the damage lead only to hairline fractures. While the pits might not be observable even though the hydration has been completed, the process of damage to the plaster coat continued from the installation of the plaster until the pitting stopped or the hydration was complete." This conclusion is not properly supported by facts, however. The undisputed facts reveal that the hydration process transforms periclase from an unstable to a stable substance. Consequently, no property damage occurs upon installation of the plaster; on the contrary, unless pitting becomes noticeable, the quality of the plaster would improve during the hydration process, since the periclase changes into a stable substance. Hence, it is only when

these reasons, the property damage here is distinct from the damage in asbestos bodily injury cases or toxic property damage cases such as *Montrose*, where damage allegedly occurred upon first exposure to the DDT. In this case, as in *Fireman's Fund* and *Pines*, property damage did not occur until the plaster-pitting actually manifested, so the manifestation trigger ought to determine which insurers' policies must afford coverage for the homeowners' claims.

Moreover, the Court finds the reasoning of the California Supreme Court in *Prudential* compelling even in this third-party context. The manifestation trigger creates greater certainty for insurers: Once their policies expire, they need not fear liability for property damage that was festering unseen during their policy period. Consequently, insurers need not maintain reserves to cover liabilities arising from expired policies, and this benefit should be passed on to insureds through lower insurance costs. Likewise, the manifestation trigger satisfies the reasonable expectations of insureds: Even after their policies expire, they are guaranteed coverage for property damage that manifested prior to the expiration date, even if the damage progresses.

 Finally, unlike the continuous injury trigger, the manifestation trigger avoids a conflict with the loss-in-progress rule. The loss-in-progress rule is based on the principle that insurance is designed to protect against contingent or unknown risks of harm, rather than harm that is certain or expected. *Chu v. Canadian Indem. Co.*, 224 Cal.App.3d 86, 94–95, 274 Cal. Rptr. 20 (4th Dist.1990); Cal. Ins.Code §§ 22, 250 (1972). Accordingly, the loss-in-progress rule precludes coverage for losses that were known before the policy period, even if the damage progresses during the policy period. *Chu*, 224 Cal.App.3d at 95, 274 Cal.Rptr. 20.

The loss-in-progress rule and the manifestation trigger complement one another and protect the insured's access to insurance: To use the current case as an example, even after plaster-pitting manifested in the first home, subsequent insurers would be willing to issue policies to Chemstar because they could rely on the loss-in-progress rule to preclude coverage for progressive plaster-pitting. By contrast, the continuous injury trigger risks exposing the insured to gaps in coverage: Once plaster-pitting manifests in the first home, a potential insurer that is aware of the heightened risk of further plaster-pitting in other homes would be unwilling to issue policies to Chemstar because the insurer would be held liable for plaster-pitting that occurs during its policy period.

For these reasons, the Court concludes that coverage is triggered when property damage first manifests, and the insurer on the risk at the time of first manifestation is liable for the entire loss, even if the property damage progresses after the policy expires.

### B. *Application of the Manifestation Trigger*

 It now remains to be decided whether the plaster-pitting constitutes one or more coverage triggers, in light of the fact that the pitting manifested in 28 different homes at 28 different times. As described above, several California courts have held the insurer on the risk at the time of first manifestation liable for all property damage to a single building, even though the damage progressed during a subsequent insurer's policy period. *See Prudential*, 51 Cal.3d 674, 274 Cal.Rptr. 387, 798 P.2d 1230 (apartment building); *Pines*, 5 Cal.App.4th 714, 7 Cal.Rptr.2d 53 (condominium project); *Fireman's Fund*, 223 Cal.App.3d 1621, 273 Cal.Rptr. 431 (hotel facade); *Home*, 205 Cal.App.3d 1388, 253 Cal.Rptr. 277 (hotel). However, it appears that no court, in California or elsewhere, has been confronted with a case such as this, where the same property dam-

---

this hydration process is so extreme that it results in noticeable pitting that property damage occurs.

age arising from a single occurrence strikes 28 different properties.

Left to its own ingenuity, the Court finds no basis in fact or logic for distinguishing between cases in which one occurrence gives rise to property damage in one or multiple buildings. On the contrary, it finds good reason to treat both types of cases the same. To begin with, finding a single trigger in both cases avoids anomalous outcomes. Without the single trigger, courts may, at their whim, allocate losses among various insurers by drawing arbitrary lines between, say, two condominiums in the same building, two halves of one duplex, a house and a guest house on one property, or two homes on the same street.

Such anomalous outcomes do not merely create petty complications in the law. They also expose insurers to greater uncertainty: Although an insurer may escape liability in one court, it has no guarantee that the next court will not hold it liable on similar facts. Since the insurer must prepare for such contingencies, its uncertainty will adversely affect the insured by increasing the cost of insurance. Both insurer and insured deserve a more predictable and principled outcome.

Finally, finding a single trigger in both cases protects the insured's access to insurance. In this case, once plaster-pitting manifested in the first home, a potential insurer who is aware of this risk would refuse to insure Chemstar if some courts

treated plaster-pitting in a different home arising from the same occurrence as a separate trigger. By contrast, finding a single trigger protects the insurer from such potential liability and makes it willing to insure against other property damage arising from future occurrences.

■ Accordingly, the Court finds a single trigger and holds that the primary and excess insurers on the risk when the plaster-pitting manifested in the first home are liable for all 28 plaster-pitting claims.[15] The date of first manifestation remains to be determined as a matter of fact. However, as a matter of law, the Court determines that the date of first manifestation is that point in time when appreciable plaster-pitting first occurred and was or should have been known to one of the homeowners. *See Prudential*, 51 Cal.3d at 699, 274 Cal.Rptr. 387, 798 P.2d 1230.

### C. *Impact of Single Trigger on the Loss–in–Progress Rule*

National also moves for summary judgment that coverage under its policies was barred by the loss-in-progress rule. This motion is rendered moot by the Court's decisions regarding occurrence and trigger, given that the plaster-pitting clearly manifested by 1985 when the first homeowner claims were made, well before the start of National's policy periods. Thus, National's policies could not have been triggered by this property damage, regardless of the loss-in-progress rule.[16]

---

**15.** Chemstar also argues for a single trigger on the theory that the plaster-pitting "progressed" from home to home. Although the Court finds a single trigger, it rejects Chemstar's "progression" theory. As noted before, plaster-pitting never occurred in some homes despite the presence of periclase-tainted lime; rather, pitting occurred only where the periclase pellets were sufficiently large, numerous and close to the plaster surface. Thus, as a matter of fact, the plaster-pitting cannot be said to "progress" from home to home, since it skipped over some homes entirely.

**16.** Had the Court found multiple triggers and therefore reached this issue, it would have denied National's motion for two reasons. First, National's reliance on *Chu*, 224 Cal.App.3d 86, 274 Cal.Rptr. 20, is misplaced. In that case, the California appellate court emphasized that the

loss-in-progress rule applies only if the insured had actual knowledge of a latent defect; by contrast, the rule does not apply where the insured "may have had notice of facts which would incite investigation by a reasonably prudent person" and the insured "negligently failed to investigate and obtain actual knowledge of the existence of such defects." *Id.* at 99, 274 Cal.Rptr. 20. Here, National has not shown that GLC knowingly sold lime with high concentrations of periclase for indoor use. On the contrary, National has shown that GLC tried to avoid such a result through its quality control system, although the quality control system was informal, perhaps even negligent.

Second, several courts have held that the loss-in-progress rule does not preclude coverage as long as the property damage remains contingent, even if the property damage is inevitable.

### III. *Duty to Defend*

Finally, National moves for summary judgment that it had no duty to defend Chemstar or, alternatively, that Liberty's contribution claim for defense costs is barred by the doctrine of unclean hands. Neither argument has merit. First, an insurer's duty to defend is "determined on the basis of any *potential* liability arising from facts available to the insurer from the complaint or other sources available to it at the time of the tender of defense." *CNA Casualty of California v. Seaboard Sur. Co.,* 176 Cal.App.3d 598, 605, 222 Cal.Rptr. 276 (1st Dist.1986). In this case, the potential for coverage arose once plaster-pitting developed during National's policy periods, and the law was far too uncertain for National to presume its policies would not be triggered by the plaster-pitting claims.

Second, Liberty's contribution claim is not barred by the doctrine of unclean hands. Although the jury in the first phase of trial determined that Liberty acted in bad faith when it abandoned Chemstar's defense, Liberty's misconduct was not aimed at National, and National will suffer no harm as a consequence of it. In such a case, the doctrine of unclean hands is inapplicable. *See Martin v. Kehl,* 145 Cal.App.3d 228, 239 n. 1, 193 Cal.Rptr. 312 (2d Dist.1983); *Estate of Blanco,* 86 Cal. App.3d 826, 833, 150 Cal.Rptr. 645 (2d Dist. 1978); *Wiley v. Wiley,* 59 Cal.App.2d 840, 139 P.2d 950 (1943).

Although the Court is not persuaded by National's arguments, it nonetheless finds that Liberty's contribution claim for defense costs is precluded for another reason. Although National owed a duty to defend to its *insured,* that duty does not translate into a duty to its fellow *insurer.* On the contrary, under California law, the apportionment of defense costs among insurers is a matter of equity. *CNA Casualty,* 176 Cal.App.3d at 619, 222 Cal.Rptr. 276. Further, " '[w]here two in-

surers cover the same risk, defense costs must also be shared between them pro rata in proportion to the respective coverage afforded by them to the insured.' " *Id.* at 620, 222 Cal.Rptr. 276 (and cases cited therein). In this case, the Court's decisions on occurrence and trigger issues will preclude coverage of any of the plaster-pitting claims under National's policies. *See supra* 59 Cal.2d at 25–26, 27 Cal.Rptr. 689, 377 P.2d 889. Accordingly, under the California rule, National should not bear any portion of defense costs. National's summary judgment motion to preclude Liberty's contribution claim for defense costs is therefore granted.

### CONCLUSION

On cross-motions for summary judgment, the Court holds that the 28 plaster-pitting claims arose from a single occurrence (namely, a failure to warn that lime with high periclase concentrations should not be used indoors) and that all of the homeowners' property damage occurred when the plaster-pitting manifested in the first home, thus triggering coverage under only those policies effective at the time of first manifestation. As a matter of law, the date of first manifestation is that point in time when appreciable plaster-pitting first occurred and was or should have been known to the first homeowner. In addition, National's summary judgment motion as to Liberty's contribution claim for defense costs is granted because coverage under National's policies is precluded by the Court's decisions regarding occurrence and trigger issues.

IT IS SO ORDERED.

---

*See Prudential,* 51 Cal.3d at 695, 274 Cal.Rptr. 387, 798 P.2d 1230; *Sabella v. Wisler,* 59 Cal.2d 21, 57, 27 Cal.Rptr. 689, 377 P.2d 889 (1963); *Fireman's Fund,* 223 Cal.App.3d at 1627, 273 Cal.Rptr. 431 n. 5. Here, where plaster-pitting occurred only if the periclase pellets were sufficiently large, numerous and close to the plaster surface, the property damage remained contingent until pitting actually manifested.