Seneva **BERRY** dba Sunny Farms, Plaintiff,

v.

**COMMERCIAL UNION INSURANCE COMPANIES, a Corporation, Defendant.**

**No. CV–F 94–5161 REC/DLB.**

United States District Court, E.D. California.

Feb. 6, 1995.

Lanny T. Winberry, Law Offices of Lanny T. Winberry, Bret Culbreth, Law Offices of Bret Culbreth, Stephen Nelson Cole, Cole and Culbreth, Sacramento, CA, for plaintiff.

Michael M. Pollak, Pollak and Vida, Los Angeles, CA, for defendant.

## AMENDED ORDER RE CROSS MOTIONS FOR SUMMARY JUDGMENT

COYLE, Chief Judge.

On November 14, 1994, this Court heard cross motion for summary judgment. For the reasons set forth herein, plaintiff's motion for summary judgment is denied and defendant's motion is granted.

This Amended Order supersedes the Order issued on January 19, 1995. This Amended Order makes changes in the text but does not alter this Court's prior holding.

## I. BACKGROUND

Plaintiff Seneva Berry, dba Sunny Farms, entered into an insurance contract with defendant Commercial Union Insurance Company. While the insurance policy was in effect, copper hydroxide based fungicides (Kocide 606 and Champ) were used at Sunny Farms by running them through its aluminum irrigation pipe. The fungicides severely damaged the irrigation pipes, creating holes and (according to plaintiff) damage costing over $500,000.00. This action arises from a dispute regarding whether this type of damage is covered under the insurance policy or whether it falls within the exemption provision. The policy specifically exempts loss that results from "contamination" or "deterioration."

The parties have stipulated to the facts that follow. The fungicide Champ was used March 28, 1990 through October 3, 1990, and March 13, 1991 through May 28, 1991. Kocide was used February 26, 1992 through October 5, 1992.

The labels of both fungicides contain a listing of ingredients but do not specify any warning to the effect that the fungicides are unsuitable for use in aluminum irrigation piping. After plaintiff used these fungicides, she discovered damage to the pipes which she reported to her insurance company and made a claim against her Commercial Union policy.

Investigation determined that the copper in the copper hydroxide based fungicides Champ and Kocide created a cathodic reaction with the aluminum in the irrigation pipe. This reaction damaged the pipe. The pipe's metal was compromised when the copper hydroxide based fungicides contacted the aluminum in the pipe, and the interaction caused small holes to appear and resulted in leaks.

The damage to the pipe is irreversible and ongoing, and it began with the first application of Champ or Kocide fungicides. There was no damage prior to such application.

On November 30, 1993, Commercial Union denied plaintiff's claim on the ground that the loss was excluded, and reserved all its rights. The exclusion provisions in the policy relied upon are as follows:

(a) "*We* DO NOT INSURE against loss caused by:

    1. Wear and tear, marring or scratching, deterioration, inherent vice, latent defect or mechanical breakdown.

    2. Rust, mold, or wet or dry rot.

3. Contamination, smog or smoke from agricultural smudging or industrial operations ...

(b) "CU will not pay YOU for loss or damage caused by, resulting from, contributed to, or aggravated by faulty, inadequate, or defective:

1. Planning, zoning, development;
2. Design, development of specifications, workmanship, construction;
3. Material used in construction;

or

4. Maintenance of property whether on or off the insured premises by any person or organization. However, this exclusion only applies if a peril otherwise excluded by this policy substantially contributes to the loss...."

Plaintiff submits two affidavits at the eleventh hour.[1] The affidavit of Dr. David Howitt describes the process that occurs when this pesticide is flushed through aluminum irrigation pipes: "a very rapid deterioration of the aluminum pipes occurs under these conditions and will subsequently render the pipes unusable after only one application of such copper hydroxide based fungicide ... after only one application ... an irreversible cathodic reaction occurs whereby the pipes will ultimately be destroyed. The metal in the aluminum pipes is not actually contaminated with copper. The two metals are chemically quite separate and it is the galvanic couple, or electrical contact that is established between them, that is responsible for the rapid deterioration of the pipes."

Berry's foreman, Mariano Salinas, states in an affidavit: "Upon the first use of the aluminum irrigation pipes in the summer of 1991 after the application of Champ in March 1990, I had to remove and change some of the pipes in the fields because of the leakage due to holes in the pipe."

For the purposes of summary judgment only, the parties have agreed that the damage to the subject irrigation pipe would be covered under the policy if not barred by the foregoing policy exclusions.

## II. LEGAL STANDARD FOR SUMMARY JUDGMENT

The moving party has the burden to establish that there is no genuine issue of material fact as to one or more elements of plaintiff's claim for relief, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.Proc. 56(c); *British Airways Board v. Boeing Co.*, 585 F.2d 946, 951 (9th Cir.1978). On the other hand, movant has no burden to negate or disprove matters on which the non-movant will have the burden of proof at trial—including each element of its claims. Indeed, the movant need not produce any evidence at all on those matters. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The movant's burden is met simply by pointing out that there is an absence of evidence to support the non-movant's case. *Id.*

The non-movant must go beyond the pleadings and by its own affidavits, or by deposition, interrogatories and admissions on file, designate specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 317, 106 S.Ct. at 2549. To avoid summary judgment, the non-movant must demonstrate a "genuine" issue of "material" fact on *all* matters as to which it has the burden of proof, including each element of its claims.

Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no "genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "The mere existence of a scintilla of evidence ... will be insufficient ... There is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing

---

1. The court acknowledges the defendant's objections based on the Ninth Circuit's *Foster–Radobenko* rule, but considers the affidavits because they do not alter the outcome of the case in defendants favor and because this court has serious doubts that they rise to the requisite level of a "sham."

it, upon whom the onus of proof is imposed."
*Id.*

## III. CROSS MOTIONS FOR SUMMARY JUDGMENT

### A. *Summary of the issue*

The parties stipulated that the damage was caused by the fungicides. However, plaintiff Berry now moves for summary judgment, claiming the exclusion provisions of the policy do not apply to the damage to her irrigation pipes because neither "contamination" or "deterioration" was the "efficient proximate cause" of the damage. She argues that the legal cause of the damage was the fungicide manufacturer's failure to warn that these substances would erode aluminum irrigation pipes.

Defendant Commercial Union opposes Berry's motion and moves for summary judgment, claiming that the cause of the damage, as a matter of law, was deterioration and thus, it is excluded. Defendant also argues that even if either contamination or failure to warn was the "efficient proximate cause," both of these causes are excluded by the insurance policy.

### B. *Deterioration*

■ The defendant argues that summary judgment is appropriate here based primarily on *Brodkin v. State Farm Fire & Casualty Co.*, 217 Cal.App.3d 210, 265 Cal.Rptr. 710 (1989); and *Murray v. State Farm Fire & Casualty Co.*, 219 Cal.App.3d 58, 268 Cal. Rptr. 33 (1990). This court agrees.

In *Brodkin,* the court explained that damage is "deterioration" where an external corrosive causes slow disintegration.

> . . . the Brodkins assert the damage is due to the presence of corrosives in the soil. If the existence of cow urine, swamp seepage, or other corrosives in the soil is the proximate cause of damage to the foundation of the house, the claim is clearly barred under that part of the policy which excludes claims for the "leakage or seepage of water," "wear, tear," "deterioration," "inherent vice" and "contamination." The plain meaning of the exclusion is the insurer will not cover slow-moving disintegration or corrosion of the concrete foundation because of external forces.

In *Murray,* plaintiffs discovered a water leak in their home caused by a break in a copper pipe. The leak in the pipe caused the ground underneath their home to shift which damaged the home.

> Experts agreed that the leak was caused by a process known as electrolysis, precipitated when the pipe was exposed to a combination of moisture and acidic soil . . . One of the experts described the electrolysis as involving "a chemical reaction of dissimilar metal in the presence of an acid solution. The transfer of electrons from one metal to another relieves that one metal of a portion of its thickness and structural integrity as evidenced by accelerated corrosion." The process resulted first in a pinhole and later in a serious rupture of the pipe.

*Murray,* supra, 219 Cal.App.3d at 61, 268 Cal.Rptr. 33. The insurance policy excluded claims involving wear, tear and deterioration. The court rejected plaintiff's argument that the exclusion should be interpreted to apply only to "normal" deterioration of the sort a homeowner can predict and plan for, and that a triable issue existed based on expert declarations that 17 years was not the "normal" life span for a copper pipe. The court held:

> We can assume the correctness of the Murrays' premise, i.e. that the normal useful life of copper pipe is considerably longer than 17 years. Nonetheless, the Murrays' proffered interpretation of the exclusion does not withstand scrutiny. We appreciate the possibility that there may be cases which would call into question the exact parameter of the term "deterioration." We can envision situation in which a homeowner suffers damage which is not instantaneous but nonetheless occurs over a sufficiently short period of time that it could not be characterized as deterioration. This is not such a case. According to one of the Murrays' own experts, the electrolysis process which caused the breakdown of the copper pipe "takes place over a fairly long period of time." He estimated the

pipe may have begun leaking a year before the leak was discovered.

These facts lead inevitably to the conclusion that the copper pipe failed as a result of deterioration. The Murrays' homeowners' policy expressly excludes coverage for losses resulting from deterioration. The exclusion is not limited to deterioration which is usual, ordinary, or normal.

*Id.* at 63, 268 Cal.Rptr. 33.

Similarly here, the damage to plaintiff's irrigation pipes can *not* be characterized as instantaneous damage occurring over a short period of time. In this case, an unusual reaction resulted in small ruptures that developed into major damage reported to the insurance company *two years* after the first application of the pesticides. An external force, the pesticides, reacted with the metals in the irrigation pipe in a manner that caused slow-moving disintegration or corrosion. This scenario falls within both *Murray* and *Brodkin*.[2]

The affidavit by the foreman does not change the fact that Berry did not report appreciable damage to her insurance company for two years after the pesticides were flushed through the pipes. Moreover, the affidavit states that *some* pipes were replaced in the summer of 1991 after the application of Champ in March of 1990. The time between the "irreversible cathodic reaction" (as described by the Dr. Howitt) and removal of some pipes is over one year. In *Murray*, the court specifically pointed to expert testimony that "the electrolysis process which caused the breakdown of the copper pipe 'takes place over a fairly long period of time.' ... the pipe may have begun leaking a year before the lead was discovered." *Murray*, supra, 219 Cal.App.3d at 63, 268 Cal.Rptr. 33. Here, the most favorable interpretation of the facts for plaintiff shows that the reaction occurred upon first application of the pesticides in 1990, and the process caused *some*

pipes to leak one year later, and caused destruction of the pipes two years later. This is not damage occurring over a short period of time.

◼ Even if the foreman's affidavit meant that the pipes were damaged instantly in the summer of 1990 but not used again until 1991 at which time *some* leaks were discovered, the outcome is the same. The pipes still were used for an entire season before the damage was finally reported to the insurance company. The plaintiff cannot have it both ways. If the damage was not "appreciable" in 1990, then the process of deterioration clearly occurred over a two year period. If the damage was "appreciable" in 1990, then the plaintiff's claim is barred by the insurance policy's statute of limitations.[3] The statute begins to run at that point in time when "appreciable" damage occurs and the insured knows or should know about the damage, such that a reasonable insured would be aware that the notification duty under the policy has been triggered. *Prudential–LMI Com. Ins. v. Superior Court*, 51 Cal.3d 674, 274 Cal.Rptr. 387, 798 P.2d 1230 (1990).

Plaintiff's own expert, Dr. Howitt, described the process as one of "rapid deterioration." Whether or not the damage was "slow moving" or "sufficiently rapid" to constitute "deterioration" as a matter of law is a legal question. The court in *Murray* focused on the length of time the damage took to finally manifest. Dr. Howitt's testimony shows that a chemical reaction occurred upon the first application in 1990, causing irreversible disintegration to occur. The evidence shows that the damage was not noticed by Berry for one or two years, and in any event, was not reported to the insurance company until two years after that first irreversible cathodic reaction occurred. Accordingly, the damage to the irrigation pipes falls within

---

2. This scenario tracks the language upon which the *Brodkin* court based its legal conclusion: The plain meaning of the exclusion is that the insurer will not cover slow-moving disintegration or corrosion of the concrete foundation because of external forces. *Brodkin*, supra 217 Cal.App.3d at 217, 265 Cal.Rptr. 710.

3. The policy's one year period of limitation provides: "*You* cannot sue *us* under this policy unless *you* have complied with all the policy provisions and filed the suit within one year after the loss occurred." (Agripolicy booklet, page 36, Exhibit "B" of Deft. Opp. to Plt. Summ. J. Motion).

the policy exclusion for "deterioration" as a matter of law.

### C. *Plaintiff's motion is denied*

■ This court denies plaintiff's motion and rejects her argument that the "proximate efficient" cause of the damage was the fungicide manufacturer's failure to provide a warning that the chemicals would erode aluminum irrigation pipes. Plaintiff's argument is based on the concept of proximate causation. In *Garvey v. State Farm Fire & Casualty Co.*, 48 Cal.3d 395, 402, 257 Cal.Rptr. 292, 770 P.2d 704 (1989), the court affirmed the efficient proximate cause analysis first set forth in *Sabella v. Wisler*, 59 Cal.2d 21, 27 Cal.Rptr. 689, 377 P.2d 889 (1963).

> [I]n determining whether a loss is within an exception in a policy, **where there is a concurrence of different causes,** the efficient cause—the one that sets others in motion—is the cause to which the loss is to be attributed, though the other causes may follow it, and operate more immediately in producing the disaster.

*Garvey,* supra, 48 Cal.3d at 402, 257 Cal. Rptr. 292, 770 P.2d 704. *See also Allstate Ins. Co., v. Smith,* 929 F.2d 447, 449 (9th Cir.1991). Plaintiff's reliance on the proximate cause analysis is misplaced because this action does not involve a concurrence of different causes. The parties stipulated to the fact that the damage was caused by the fungicides. The cause of the damage is not in dispute.[4] Rather, plaintiff's argument addresses the cause of her decision to flush the fungicides through the pipe. This court carefully considered plaintiff's argument and is sympathetic to her predicament. Clearly, plaintiff has a claim against the fungicide manufacturer. However, this action concerns coverage of the pipes under the insurance policy, and the manufacturer's failure to warn is too attenuated.

■ For purposes of insurance coverage, the policy specifically excluded the scenario presented. Legally, a deterioration exclusion encompasses destruction of pipes that occurs from slow-moving disintegration caused by contact with an external force. Deterioration caused by an *unanticipated* or *unusual* contact still falls within an insurance policy's "deterioration" exclusion. (*See Murray* ). Here, the fungicides are an external source that came into conduct with the pipes causing slow disintegration. Such slow-moving disintegration falls within the "deterioration" exclusion as a matter of law.

ACCORDINGLY, IT IS ORDERED THAT the plaintiff's motion for summary judgment is denied, and defendant's motion of summary judgment is granted.

---

4. *Howell v. State Farm Fire Casualty Co.,* 218 Cal.App.3d 1446, 267 Cal.Rptr. 708 (1990) is inapposite. There, a landslide damaged a property owner's home. The court found that a concurrence of causes resulted in the damage—heavy rains, a landslide, and a fire which burned the hillside vegetation. A genuine issue of fact existed as to the "proximate efficient cause." Here, the cause is not in dispute. Moreover, *Howell* did not involve the slow disintegration of a structure caused by a corrosive or chemical.