Filed 10/30/24  Rotan Holdings v. AU Energy CA2/6
Opinion following rehearing

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SIX

| | |
|---|---|
| ROTAN HOLDINGS, LLC, | 2d Civ. No. B324832 |
| | (Super. Ct. No. 56-2018- |
| Plaintiff and Appellant, | 00516210-CU-OR-VTA) |
| | (Ventura County) |
| v. | |
| | OPINION ON REHEARING |
| AU ENERGY, LLC, | |
| | |
| Defendant and Respondent. | |

Rotan Holdings, LLC, (Rotan) appeals from the judgment in favor of respondent AU Energy, LLC (AU Energy), following a court trial.  Rotan contends the trial court erroneously ruled that it had not proved slander of its title to a gas station.  The ruling was based on insufficiency of the evidence to establish that the slander had caused Rotan to suffer a direct pecuniary loss.  Rotan also contends the trial court erroneously sustained, without leave to amend, AU Energy's demurrers to causes of action for breach of an implied covenant of good faith and fair dealing and for intentional/negligent interference with prospective economic advantage.  We affirm.

*Factual and Procedural Background*

In its opening brief Rotan expressly accepts the facts as found by the trial court in its 19-page statement of decision. Accordingly, we summarize the facts based on the statement of decision and our review of the record.

This case concerns a gas station in Thousand Oaks, hereafter "the property" or "the station." Jenda, Inc. (Jenda), was the lessee and operator of the station. Jenda was owned by Samuil and Polina Preys.

Respondent AU Energy had a "contract with Shell" Corporation whereby Shell would provide fuel to AU Energy, which in turn would sell the fuel to gas stations. In January 2012 AU Energy and Jenda entered into a contract entitled, "Retailer Product Sales Agreement" (RPSA). AU Energy agreed to sell to Jenda, and Jenda agreed to buy, minimum quantities of Shell-branded fuel over a 12-year period ending on January 31, 2024.

"The RPSA . . . required the gas station be 'branded' as a 'Shell' outlet, and Jenda was restricted to selling only fuel purchased from AU [Energy] and bearing the 'Shell' identification. The RPSA provided that it could be terminated by the mutual written agreement of the contracting parties. The terms of such an agreement . . . were not specified."

The RPSA's first amendment, signed in January 2013, set forth a formula for calculating AU Energy's damages in the event of Jenda's early termination of the RPSA. The amendment provided that the amount calculated pursuant to this formula "constitutes a reasonable estimate of [AU Energy's] damages" and shall be paid by Jenda "within thirty (30) days of the date of termination . . . as liquidated damages."

2

AU Energy agreed to make a "'$250,000 prepayment of incentive money'" to Jenda. "A condition to the payment . . . was that the station retain the 'Shell' identity over the 12-year term of the RPSA." The liquidated damages payable by Jenda upon early termination of the RPSA included, inter alia, all of the $250,000 incentive money if 48 months or more remained on the contract.

When the RPSA was signed, AU Energy did not pay any incentive money to Jenda. Jenda subsequently signed a security agreement, and AU Energy paid Jenda $70,000 of the $250,000 incentive money.

In March 2016 appellant Rotan purchased the station for $3.7 million. Rotan's owner was Roman Preys, the son of Jenda's owners, Samuil and Polina Preys. The station continued to be leased to and operated by Jenda.

In May 2016 Rotan executed a deed of trust (DOT) for the benefit of AU Energy. The DOT encumbered the station and said that it secured Rotan's obligatory payments to AU Energy under the RPSA. But Rotan was not a party to the RPSA, did not sign it, and did not have any obligations under that contract. The RPSA was signed by Jenda, a separate entity. Kpish Goyal, AU Energy's attorney who had drafted the DOT, testified that he had committed "a typo" by saying that the DOT secured Rotan's obligations instead of Jenda's.

"After the DOT was recorded, AU [Energy] paid Jenda the rest of the [$250,000 incentive] money, [i.e.,] $180,000." When the DOT was being negotiated, Goyal sent an email to Rotan in which he said the DOT "will secure the payment of the $250k 'upfront' investment." But this $250,000 limitation was not incorporated into the language of the DOT.

In 2017 Prenton, Inc., (Prenton) "took over . . . Jenda's position as the operator of the station." Prenton was owned by Roman Preys' former wife, Tatiana Linton. Rotan states that Prenton "succeeded to Jenda's interest as the tenant of the Station."

"In early 2018, Rotan was presented with an opportunity to sell the property to a third party, Moller Investment Group ('Moller') for $11 million. . . . One condition of the sale was . . . that the property be delivered with the gas station 'unbranded.' This meant terminating the RPSA."[1]

Prenton's owner, Tatiana Linton, was a disbarred attorney. Despite her disbarment, she represented both Rotan and Prenton in negotiations with AU Energy concerning the termination of the RPSA. "Goyal informed Linton that AU [Energy] would agree to terminate the RPSA in exchange for $1.3 million. More than half of that sum was money that AU [Energy] would be required to pay Shell as a penalty. The balance was calculated on the basis of the liquidated damage[s] provision in the [first] amendment to the RPSA. Linton objected to the sum. She expected that Prenton would only be responsible for the liquidated damages." In its opening brief Rotan claims that the liquidated damages would have been "no more than $524,100[,] not $1.3 million."

On May 9, 2018, Linton emailed Goyal: "I have been authorized to offer a compromise: Rotan will repay the entire [$]180,000.00 [incentive money] advance in return for an immediate re-conveyance of the . . . DOT. . . . [¶] In the event the compromise offer is not accepted, . . . Rotan will initiate legal

---

[1] At trial in June 2022, Roman Preys opined that the market value of the property had declined to between $6 and $6.5 million.

proceeding[s] to rescind the DOT and will seek damages to the fullest extent allowed by law." AU Energy did not accept Linton's offer. It insisted that the DOT secured all of Jenda's obligations under the RPSA without a dollar limit.

Moller "terminated the purchase agreement [of the station] because Rotan could not deliver [the] property 'unbranded.'"

*Rotan's Operative Third Amended Complaint*

For purposes of this appeal, the only relevant causes of action are the first for declaratory relief and the third for slander of title. The first cause of action sought a judicial declaration that (1) the DOT secures Jenda's obligations under the RPSA up to a maximum of $180,000, and (2) Rotan "is entitled to a reconveyance of the [DOT] upon payment of the sum of $180,000 to [AU Energy]."

The third cause of action alleged that AU Energy had slandered Rotan's title to the property by wrongfully "contend[ing] that [Rotan] has agreed by entering into the [DOT] to guarantee [without limitation] all of the performance obligations of Jenda under the [RPSA]." Rotan claimed that, as a result of the slander of title, it "has been unable to accept an offer from a ready, willing and able buyer to purchase the [property] for $11 million because the [DOT] encumbers and impairs the title of the [property]."

*AU Energy's Cross-Complaint*

AU Energy filed a cross-complaint. It consisted of two causes of action. The first cause of action sought to reform the DOT so that instead of securing the performance of Rotan's obligations under the RPSA, the DOT would secure the performance of Jenda's obligations under the same instrument. The second cause of action sought a judicial declaration that the

5

DOT secures all of Jenda's obligations under the RPSA with no dollar limit, not just obligations up to $180,000 as contended by Rotan.

*Trial Court's Judgment*

Following a court trial, judgment was entered "order[ing] a judicial declaration that, notwithstanding the actual words of the [DOT stating that it secured Rotan's obligations under the RPSA]," the DOT actually secured "all performance and payment obligations [of] Jenda, or its successors, owed to AU Energy . . . under the [RPSA] in an amount not to exceed $250,000." The judgment stated, "Rotan has not proven its claim for slander of title and no relief is awarded for that claim."

*Slander of Title*

"Slander or disparagement of title occurs when a person, without a privilege to do so, publishes a false statement that disparages title to property and causes the owner thereof "'some special pecuniary loss or damage.'" [Citation.] The elements of the tort are (1) a publication, (2) without privilege or justification, (3) falsity, and (4) direct pecuniary loss. [Citations.] If the publication is reasonably understood to cast doubt upon the existence or extent of another's interest in land, it is disparaging to the latter's title. [Citation.] The main thrust of the cause of action is protection from injury to the salability of property [citations], which is ordinarily indicated by the loss of a particular sale, impaired marketability or depreciation in value [citations]." (*Sumner Hill Homeowners' Assn., Inc. v. Rio Mesa Holdings, LLC* (2012) 205 Cal.App.4th 999, 1030.)

*The Trial Court Did Not Err in Finding for*
*AU Energy on the Slander of Title Cause of Action*

The slander of title cause of action was based on AU Energy's mischaracterization of the extent of Rotan's liability under the DOT. AU Energy wrongly claimed that the DOT secured all of Jenda's obligations under the RPSA with no dollar limit. The court found that the DOT secured Jenda's obligations up to $250,000. In its statement of decision, the trial court said Rotan was not entitled to judgment in its favor because it had failed to establish the tort's fourth element – AU Energy's allegedly slanderous publication had caused Rotan to suffer a direct pecuniary loss. "The publication of an injurious falsehood is a legal cause of pecuniary loss if [] it is a substantial factor in bringing about the loss . . . ." (Restatement (Second) of Torts (1977) § 632.)

The trial court noted that Rotan "contends it was harmed in two ways by AU [Energy's] mischaracterization of the obligation secured by the DOT: the loss of the Moller deal and the loss of the [ability to refinance the loans on the property]." In its opening brief Rotan "concedes it did not suffer . . . a loss as to the . . . inability to refinance its existing loans."

As to the alleged loss of the Moller deal, the trial court stated: "It was AU [Energy's] refusal to terminate the RPSA on terms agreeable to Prenton [Jenda's successor in interest], and not AU [Energy's] mischaracterization of the DOT, that caused Rotan to lose the Moller deal. Therefore, Rotan has not proved that it suffered a 'direct and immediate pecuniary loss' from AU [Energy's] allegedly defamatory statement." "[T]he existence of the DOT was totally irrelevant to what transpired: Rotan's motivation (i.e., to sell the property), the prejudice claimed by

7

Rotan (i.e., loss of the Moller deal), and the cause of the prejudice (i.e., the disagreement over terms of [the] termination agreement) would have been the same even if the property was not encumbered by a deed of trust." In other words, irrespective of the DOT, AU Energy would still have demanded that Prenton pay $1.3 million to terminate the RPSA, and Prenton would have refused to pay this amount because it believed it was responsible only for liquidated damages of "no more than $524,100." Moller would not have purchased the property because, without the termination of the RPSA, Rotan could not have delivered the station "unbranded."

Rotan contends the standard of review "is *de novo* because the facts found by the trial court are not disputed . . . ." "[W]here the facts on appeal are settled or not in dispute, the determination of proximate cause becomes a question of law." (*Sabella v. Wisler* (1963) 59 Cal.2d 21, 32; accord, *Mission National Ins. Co. v. Coachella Valley Water Dist.* (1989) 210 Cal.App.3d 484, 492.) "[T]o the extent pure questions of law were decided by the trial court upon undisputed facts, a de novo standard will apply at the appellate level." (*Bhatt v. State Dept. of Health Services* (2005) 133 Cal.App.4th 923, 928.) We therefore exercise our independent judgment based on the facts found by the trial court in its statement of decision.

In the statement of decision's section entitled "**Factual Findings**," the trial court found as follows: "On January 24, 2018, Goyal informed Linton that AU [Energy] would agree to terminate the RPSA in exchange for $1.3 million[, more than twice the amount provided by the RPSA's liquidated damages clause]. . . . Linton objected to the sum. She expected that Prenton would only be responsible for the liquidated damages.

8

The discussions stalled at that point." "Prenton and AU [Energy] could not come to terms on an agreement to terminate the RPSA, and with the RPSA in place, the gas station remained 'branded.'" "One condition of the sale [of the gas station] was . . . that the property be delivered with the gas station 'unbranded.' This meant terminating the RPSA." "Moller . . . terminated the purchase agreement because Rotan could not deliver [the] property 'unbranded.'"

Based on the above factual findings, we agree with the trial court that "[i]t was AU [Energy's] refusal to terminate the RPSA on terms agreeable to Prenton, and not AU [Energy's] mischaracterization of the DOT [i.e., not its alleged slander of Rotan's title to the property], that caused Rotan to lose the Moller deal." Accordingly, Rotan failed to prove an essential element of its cause of action for slander of title -- the allegedly slanderous publication caused Rotan to suffer a direct pecuniary loss.

*Demurrer*

"A demurrer tests the legal sufficiency of factual allegations in a complaint. [Citation.] A trial court's ruling sustaining a demurrer is erroneous if the facts alleged by the plaintiff state a cause of action under any possible legal theory. [Citations.]" (*Lee Newman, M.D., Inc. v. Wells Fargo Bank* (2001) 87 Cal.App.4th 73, 78.)

"[W]e apply the de novo standard of review in an appeal following the sustaining of a demurrer . . . ." (*California Logistics, Inc. v. State of California* (2008) 161 Cal.App.4th 242, 247 (*California Logistics*).) "[W]e assume the truth of all facts properly pleaded in the complaint and its exhibits or attachments, as well as those facts that may fairly be implied or inferred from the express allegations. [Citation.] 'We do not,

9

however, assume the truth of contentions, deductions, or conclusions of fact or law.' [Citation.]" (*Cobb v. O'Connell* (2005) 134 Cal.App.4th 91, 95.)

On appeal, "[t]he plaintiff has the burden of showing that the facts pleaded are sufficient to establish every element of the cause of action and overcoming all of the legal grounds on which the trial court sustained the demurrer, and if the defendant negates any essential element, we will affirm the order sustaining the demurrer as to the cause of action. [Citation.]" (*Martin v. Bridgeport Community Assoc., Inc.* (2009) 173 Cal.App.4th 1024, 1031.)

"[I]t is an abuse of discretion for the court to sustain a demurrer without leave to amend if the plaintiff has shown there is a reasonable possibility a defect can be cured by amendment." (*California Logistics, supra,* 161 Cal.App.4th at p. 247.) "'"[S]uch a showing can be made for the first time to the reviewing court . . . .""'" (*Allen v. San Diego Convention Center Corp., Inc.* (2022) 86 Cal.App.5th 589, 597.)

<u>The Breach of Covenant Cause of Action</u>

Rotan contends the trial court erroneously sustained, without leave to amend, a demurrer to its cause of action for breach of the DOT's implied covenant of good faith and fair dealing. The cause of action alleged that, "by failing . . . to accept the payment [by Rotan] of the full amount of the [DOT's] Guarantee, $180,000, . . . [AU Energy] has breached the implied covenant of good faith and fair dealing implicit within the [DOT]."

We need not determine whether, at the time of its ruling, the trial court erroneously sustained the demurrer to the breach of covenant cause of action without leave to amend. If the trial

10

court had so erred, the error would not have been prejudicial because in its judgment the court found that the DOT secured "all performance and payment obligations [of] Jenda . . . under the [RPSA] in an amount not to exceed $250,000." Rotan does not challenge this finding. Thus, AU Energy was under no obligation to accept Rotan's offer to pay only $180,000 for the reconveyance of the DOT. (See *Curtis v. Twentieth Century-Fox Film Corp.* (1956) 140 Cal.App.2d 461, 464-465 [no prejudicial error in sustaining demurrer without leave to amend because at trial a similar claim was resolved against plaintiff]; *Arp v. Blake* (1923) 63 Cal.App. 362, 370-371 [trial court erred in sustaining demurrer as to a cause of action, but error was not prejudicial because the court tried the same issues in a different cause of action and found in favor of defendant].)

The lack of prejudice is fatal to Rotan's claim of error: "Our state Constitution provides that '[n]o judgment shall be set aside, or new trial granted, in any cause, . . . for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice.' (Cal. Const., art. VI, § 13.) 'The effect of this provision is to eliminate any presumption of injury from error, and to require that the appellate court examine the evidence to determine whether the error did in fact prejudice the defendant. . . .'" (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 800.)

Rotan claims AU Energy breached an implied covenant of good faith and fair dealing when it demanded that Prenton pay $1.3 million to terminate the RPSA. Rotan argues that the complaint "could have been amended to more clearly allege the

11

content and effect of [AU Energy's] . . . [d]emand and thereby clearly state its cause of action." (Fn. omitted.)

But Rotan was a party only to the DOT, which guaranteed Jenda's/Prenton's obligations to AU Energy up to $250,000. Rotan fails to adequately explain how AU Energy's demand concerning termination of the RPSA could have violated the DOT's implied covenant of good faith and fair dealing. Because Rotan was not a party to the RPSA, it did not have standing to complain of AU Energy's violation of the RPSA's implied covenant. "An allegation of breach of the implied covenant of good faith and fair dealing is an allegation of breach of an 'ex contractu' obligation, namely one arising out of the contract itself." (*Foley v. Interactive Data Corp.* (1988) 47 Cal.3d 654, 690.) "[T]he implied covenant protects only the parties' right to receive the benefit of their agreement . . . ." (*Id.* at p. 698, fn. 39; see also *Guz v. Bechtel National Inc.* (2000) 24 Cal.4th 317, 349 ["The covenant of good faith and fair dealing . . . exists merely to prevent one contracting party from unfairly frustrating the other party's right to receive the *benefits of the agreement actually made*"].)

Rotan argues that, "as a matter of law, [it] was a party to the 'agreement' (i.e., the RPSA) as a result of its status as surety" for the performance of Jenda's obligations under the RPSA. Rotan contends, "The DOT . . . was a surety deed of trust because it secured the obligation of a third party," i.e., Jenda. Rotan has not shown that, merely because it executed the DOT as a surety, it stepped into Jenda's shoes and was entitled to assert against AU Energy the same claims that Jenda was entitled to assert under the RPSA.

12

In support of Rotan's claim that it was a party to the RPSA, Rotan cites *C.O. Sparks, Inc. v. Pacific Coast Paving Co.* (1958) 159 Cal.App.2d 513 (*Sparks*). There, a building contractor furnished a bond guaranteeing its performance of a construction contract. The appellate court stated: "'A bond which is given for the faithful performance of a contract, to which it refers, binds the surety for labor performed and materials furnished thereunder as completely as though the surety were a party to the contract. . . . "It is also elementary that a bond given to guarantee the execution of a contract according to its terms becomes a part of such contract, and *to that contract the sureties become parties the same as though they had actually made and executed the contract itself.* Therefore, in interpreting the language of the undertaking for the purpose of gathering its scope or the measure of the liability of the sureties, we must do so by treating or viewing the contract and the undertaking as a whole or as constituting an indivisible contract."'" (*Id*. at p. 517, italics added.)

The above-quoted passage from *Sparks* is inapplicable here because (1) the DOT is not a construction performance bond, and (2) the DOT merely refers to the RPSA without incorporating its terms. In *Sparks* the court noted, "The bond which was furnished in this case incorporated the contract therein, and thereby all of the provisions of the contract became provisions of the bond as a performance bond." (*Sparks, supra,* 159 Cal.App.2d at p. 517; see *Cates Construction, Inc. v. Talbot Partners* (1999) 21 Cal.4th 28, 52 (*Cates Construction*) ["performance bonds typically incorporate the underlying construction contract"].)[2]

_____

[2] "A [construction] performance bond protects against loss caused by the contractor's failure to complete the contract and

Furthermore, the above-quoted passage from *Sparks* should not be taken literally: "The obligation of a surety is based solely on the bond, and it is frequently stated that sureties are never bound beyond the strict letter of their contract, but the underlying contract may be considered to assist in interpreting and measuring the extent of that obligation, especially where the underlying contract is incorporated by reference into the bond. *The surety does not become a party to the underlying contract*, but because the scope of the surety's obligation is determined by reference to that contract, it is sometimes said that sureties become parties the same as though they had executed the underlying contract." (9 Miller & Starr, *supra*, at § 32:97, fns. omitted, italics added; see *Gordon Bldg. Corp. v. Gibraltar Sav. & Loan Ass'n* (1966) 247 Cal.App.2d 1, 5-6 ["One who . . . guarantees the payment of a debt is not thus made a direct party

_____

pay all providers of labor and materials. The general provisions of the bond state that the surety will complete the project or pay for the cost of completion of the construction upon the contractor's failure to perform. The obligee usually is the owner, the lender, or both." (9 Miller & Starr, Cal. Real Est. § 32:92 (4th ed., Sept. 2024 update).) If such a performance bond is furnished and "the contractor fails to complete, the surety can step in and hire another contractor to complete the project or pay the owner its additional costs (above the contract price) to complete the project, up to the maximum amount of the bond . . . . [¶] [] If the surety refuses without justification to complete the construction contract, the obligee may complete the project in accordance with the direct contract and, after proving the amounts expended were reasonable, recover from the surety in excess of the contract balance." (Croskey et al., California Practice Guide: Insurance Litigation (The Rutter Group 2023) ¶¶ 6:2938-6:2939.)

14

to a financing agreement between the creditor and the primary obligor"].)

The trial court aptly noted: "I can certainly see an argument that Jenda could make that, 'Hey, there's a contract provision [in the RPSA] that says we can terminate this agreement by mutual consent. . . . You took unfair advantage of us by asking for more than you were ever entitled to [under the RPSA].' [¶] I can see Jenda making that argument. [¶] But I'm having trouble . . . understanding how Rotan, who is not a party to this agreement [the RPSA], gets to make that argument."

<u>Causes of Action for Intentional and Negligent</u>
<u>Interference with Prospective Economic Advantage</u>

The trial court sustained, without leave to amend, demurrers to Rotan's two causes of action alleging intentional and negligent interference with prospective economic advantage. "[T]he elements of the tort of intentional interference with prospective economic advantage . . . are usually stated as follows: "'(1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant." . . . '" (*Korea Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134, 1153.)

"The tort of negligent interference with prospective economic advantage is established where a plaintiff demonstrates that (1) an economic relationship existed between the plaintiff and a third party which contained a reasonably probable future economic benefit or advantage to plaintiff; (2) the defendant knew

15

of the existence of the relationship and was aware or should have been aware that if it did not act with due care its actions would interfere with this relationship and cause plaintiff to lose in whole or in part the probable future economic benefit or advantage of the relationship; (3) the defendant was negligent; and (4) such negligence caused damage to plaintiff in that the relationship was actually interfered with or disrupted and plaintiff lost in whole or in part the economic benefits or advantage reasonably expected from the relationship." (*North American Chemical Co. v. Superior Court* (1997) 59 Cal.App.4th 764, 786.)

Rotan's causes of action for intentional and negligent interference with prospective economic advantage alleged that, by refusing to accept its offer to pay $180,000 for the reconveyance of the DOT, AU Energy had deprived Rotan of "its prospective economic advantage in obtaining . . . the sale of the Subject Property . . . ." The trial court did not prejudicially err in sustaining the demurrers to these causes of action without leave to amend because it found that the DOT secured Jenda's obligation up to $250,000. Thus, AU Energy was under no obligation to reconvey the DOT in return for Rotan's payment of only $180,000.

Rotan contends that, by demanding that Prenton, Jenda's successor in interest, pay $1.3 million to terminate the RPSA, AU Energy intentionally or negligently interfered with Rotan's prospective economic advantage. This contention is actually a breach of contract claim. Rotan is claiming that AU Energy demanded more than it was entitled to receive under the RPSA. But Rotan was not a party to the RPSA. The claim belongs to Prenton, not Rotan.

16

Even if Rotan had been a party to the RPSA, it would not have been entitled to recovery in tort. "[A]n actor's breach of contract, without more, is not 'wrongful conduct' capable of supporting a tort [citations], including the tort of intentional interference with a prospective economic advantage [citations]." (*Drink Tank Ventures LLC v. Real Soda in Real Bottles, Ltd.* (2021) 71 Cal.App.5th 528, 533; see also *Erlich v. Menezes* (1999) 21 Cal.4th 543, 552 ["'[C]ourts will generally enforce the breach of a contractual promise through contract law, except when the actions that constitute the breach violate a social policy that merits the imposition of tort remedies'"]; *Cates Construction*, *supra*, 21 Cal.4th at p. 44 ["this court has never recognized the availability of tort remedies for breaches occurring in the context of a construction performance bond or any other so-called 'contract of suretyship'"]; *id*., at p. 43 ["Because the covenant of good faith and fair dealing essentially is a contract term that aims to effectuate the contractual [promise of the parties], 'compensation for its breach has . . . always been limited to contract rather than tort remedies'"].)

Rotan argues that the trial court erroneously sustained the demurrer without leave to amend because there is a reasonable possibility it could amend the complaint to "state a cause of action for interference with the Moller contract." The argument is forfeited because it is not supported by meaningful analysis with supporting citations to authority and the record on appeal. (*Fernandes v. Singh* (2017) 16 Cal.App.5th 932, 942-943.)

*Disposition*

The judgment is affirmed. AU Energy shall recover its costs on appeal.

17

NOT TO BE PUBLISHED.

YEGAN, Acting P. J.

We concur:

BALTODANO, J.

CODY, J.

Mark S. Borrell, Judge

Superior Court County of Ventura

_____

Law Offices of Roger N. Golden and Roger N. Golden, for Plaintiff and Appellant.

Troutman Pepper Hamilton Sanders and Peter N. Villar, Andrick J. Zeen and Elizabeth Holt Andrews, for Defendant and Respondent.